LeSUEUR, Judge.
Maxon Premix Burner Company, Inc. and Camden Fire Insurance Association have appealed from the following judgment rendered after a three week jury trial requested by Maxon and Camden:
<C * * *
“There is judgment herein in favor of Eliza Zeringue, for and on behalf of Maurice Oubre, and against Maxon Premix Burner Co., Inc., and Camden Fire Insurance Association, to the limit of its policy, jointly and in solido, in the amount of $450,000.00 for the pain and suffering of Maurice Oubre, and in the amount of $120,000.00 for the loss of future earnings by Maurice Oubre, and in the amount of $18,000.00 for medical expenses incurred by Maurice Oubre, together with legal interest thereon from date of judicial demand until paid, and all costs.
*863 «* * *
“Further, there is judgment herein in favor of Kaiser Aluminum & Chemical Co., and against Maxon Premix Burner Co., Inc., and Camden Fire Insurance Association, to the limit of its policy, jointly and in solido, in the amount of $80,000.00 for property damage, and in the amount of $13,000.00 for loss of earnings, together with legal interest thereon from date of judicial demand until paid and all costs.
“Further, there is judgment herein in favor of Kaiser Aluminum & Chemical Co., and against Maurice Oubre, through Eliza Zeringue, his curatrix, for workman’s compensation and medical expenses actually paid, not to exceed statutory limits, in the event such sums are recovered herein by Maurice Oubre.
<{ % if: % if
All other demands were dismissed.
The judgment was amended by the trial judge who reduced plaintiff’s judgment for pain and suffering from $450,000.00 to $250,000.00 by remittitur and fixed the fees of all experts at $150.00 each for each day the expert testified. In all other respects the judgment was maintained.
Kaiser Aluminum & Chemical Corporation (Kaiser), a Delaware corporation authorized to do business in Louisiana, contracted with J. T. Thorpe Company (Thorpe), a Texas corporation, for the construction of a hydrogen fluoride generator to be installed at Kaiser’s plant in Gremercy, Louisiana, as per plans and specifications drafted by Kaiser’s engineers. One of the specifications was the installation of a calibrated air/gas ratio valve manufactured by the Maxon Premix Burner Company (Maxon), an Indiana corporation, the brand name of the valve being the “Maxon Micro-Ratio Valve”. The required valve was purchased by Thorpe and installed in the generator constructed by S & R Tool & Supply Company (S & R), a Texas corporation, Thorpe’s subcontractor. The completed generator was installed by Plant Service Construction Company (Plant), a division of Barnard & Burk Industrial Corporation.
A hydrogen fluoride generator is a self-contained system which feeds air and natural gas through an apportioning valve, in this case the Maxon Micro-Ratio Valve, that controls the air to gas ratio necessary to attain and maintain combustion in the furnace burner. Temperatures within this furnace reach approximately 1600° F. The furnace-heated air is routed by combustion and recirculating air blowers through a heating jacket surrounding a large rotating drum within which the raw material, flúor spar, is tumbled, creating the hydrogen fluoride gas. The cooled air is then drawn out of the heating jacket by a return system of ducts to be reheated and recirculated. Before the furnace is lit for normal operations, the blowers in the system are started and an outside vent is opened circulating fresh air through the system and “purging” trapped air and gas in an attempt to preclude the accumulation of a combustible mixture remaining from previous operations. After the purge cycle is completed, a separate gas supply to the burner pilot is opened and the pilot is lit. The pilot light flame is detected by an ultraviolet flame detector, manufactured by the Minneapolis Honeywell Regulator Company, called in the trade a “Purple Peeper”, part of the safety circuit used to prevent the introduction of combustible quantities of air and gas before the pilot is lit. After the purple peeper detects the burner pilot light, the Maxon Safety Valve is automatically opened, allowing air and gas to flow through the Micro-Ratio Valve into the furnace burner.
On September 1, 1965, Hydrogen Fluoride Generator #3 (HF #3), with which we are concerned in this lawsuit (Kaiser had two units in operation approximately four years at this time), was installed and Kaiser accepted it. Initial “light up” procedures were commenced — the pilot and furnace burners were lit and the heat in the furnace raised slowly to allow the fur *864 nace insulation bricks to set properly. On September 8, 1965, Hurricane Betsy forced the shutdown of the unit. After inspection, the unit was put back into operation a few days later. On September 19th a “puff out” or small explosion caused minor damage to the unit and necessitated the repair of the furnace ducts. Difficulty in maintaining a burner flame necessitated another shutdown and the replacement of the pilot tip.
On September 20, 1965, Kaiser again attempted to put HF #3 into operation. The burner was' lit, the Maxon Safety Valve opened, air and gas flowed into the furnace through the Micro-Ratio Valve, which at that time outwardly indicated the minimum open position. Mr. Oubre, plaintiff herein, then ran three Orsatt tests to determine the chemical analysis of the combustion gases and the percentages of carbon monoxide, carbon dioxide, and oxygen contained therein. Immediately after Mr. Oubre finished his third Orsatt reading, the HF #3 operator, Mr. Johnson, moved the Micro-Ratio Valve to the mid-position and, as he turned toward the control board, an explosion occurred, which caused extensive physical and mental injuries to Mr. Oubre. As a result of these injuries and his subsequently being found incompetent to manage his personal affairs, Mr. Oubre has been unable to return to his job and his wife has been appointed his curatrix.
Suit was filed by Mrs. Oubre on behalf of herself and her husband against the Maxon Premix Burner Company, Inc., the General Accident Fire & Life Assurance Corporation, Ltd. and The XYZ Contracting Company of Louisiana. The Camden Fire Insurance Association (Camden) was later substituted for General Accident and Thorpe and its insurer, St. Paul Fire & Marine Insurance Company, for The XYZ Contracting Company of Louisiana.
Maxon filed an exception to jurisdiction based on a lack of minimum contacts. After its exception to jurisdiction was dismissed, Maxon answered plaintiff’s petition, reserving all rights under the exception. Camden had filed a general answer and numerous third party claims against Kaiser, Thorpe, S & R, Plant, all of Max-on’s suppliers of various valve component parts and their respective insurers. Kaiser intervened to recover the sums paid plaintiff under the provisions of the Workmen’s Compensation Act, for damages sustained to the plant, and for loss of income due to the purchase of HF gas while their #3 generator was repaired.
Due to the number of parties, many actions and counteractions were filed, the majority of which will be disposed of without discussion because the parties have been dismissed subsequent to trial and prior to this appeal. Either before trial or shortly thereafter, Maxon and Camden voluntarily dismissed all parties to this action except the following, against whom all rights were reserved: Mrs. Eliza Ze-ringue, wife of and Maurice Oubre; Kaiser Aluminum & Chemical Corporation; J. T. Thorpe Company; and St. Paul Fire & Marine Insurance Company.
On the day set for hearing this case on appeal, a settlement agreement was introduced between Mrs. Eliza Zeringue Oubre, on behalf of herself and in her capacity as legally appointed curatrix of her husband, Maurice Oubre, and Maxon Premix Burner Co. and Camden Fire Insurance Association in the amount of $237,500.00. The judgment of settlement included an order to effect a settlement between plaintiff and Kaiser for Workmen’s Compensation payments made to plaintiff. The settlement was effected as evidenced by an affidavit signed by plaintiff, plaintiff’s attorney and Kaiser’s attorney. This court dismissed plaintiff’s appeal and the appeal of Maxon and Camden against Kaiser, Thorpe and St. Paul. Kaiser’s claim against plaintiff for Workmen’s Compensation payments was also dismissed. This decision will discuss only the issues of the remaining parties, namely, Maxon, Camden, Kaiser, Thorpe and St. Paul, and the liability of *865 each defendant to the other defendants in regard to the design, construction and maintenance of Kaiser’s HF #3 generator.
In the trial court Maxon had objected to the trial court’s in personam jurisdiction because of its lack of minimum contacts within the state as required by LSA-R.S. 13:3201 and 13:3202. The trial judge dismissed Maxon’s exception to jurisdiction for two reasons: (1) Maxon and Camden were solidarily liable and the general appearance of Camden granted the court personal jurisdiction over Maxon also; and (2), Maxon made judicial admissions in another court which was a tacit acceptance of the jurisdiction of the Louisiana court.
Although on appeal Maxon has argued extensively its lack of minimum contacts with the State of Louisiana or its citizens to contest the jurisdiction of the trial court, its denial of jurisdiction for the reasons stated by the trial judge in his judgment on the exception to jurisdiction is brief, without any mention of the appearance in the U. S. District Court in Indiana. Maxon’s admission in the District Court in Indiana was a tacit acceptance of the jurisdiction of the Louisiana court, and we agree with the trial judge that:
" * * * judicial admissions on part of Maxon made in Civil Case No. 1P66-C-436, United States District Court, Southern District of Indiana, Indianapolis Division, wherein it admits that the state court in Louisiana is the more convenient forum as most of the witnesses reside in Louisiana and the transactions and events from which the liabilities of the parties arise occurred in Louisiana, argues strongly that Maxon has tacitly accepted the jurisdiction of this Court.”
In the voluminous record, Maxon contends that the design of the HF #3 generator caused the explosion, with particular emphasis placed on the constant pilot, the purple peeper, the lack of observation ports, and Kaiser’s failure to use manometers. Maxon contended that the use of a constant pilot on this HF generator furnace was negligence, theorizing that if the pilot was not lit there could be no ignition even if a combustible mixture was in the furnace, citing a subsequent bulletin of the North American Manufacturing Co., the producer of the constant pilot used on HF #3. The bulletin stated that an interrupted pilot would be an added safety factor if another part of the system failed, i.e., “Fuel/air ratio goes sick by error or accident * * * Kaiser from past experience was satisfied with the performance of the constant pilots on HF #1 and #2. Contrary to Maxon’s contention, the use of a constant pilot was not negligence per se. Mr. Hopkins, Thorpe’s officer in charge of construction of Kaiser’s HF #3 generator, testified that a constant pilot on a furnace as found here was normal practice, similar to other units of that type, and specified by Kaiser. Mr. LaCoste, Kaiser’s Maintenance Supervisor, testified that Kaiser was satisfied with the performance of the constant pilots on HF #1 and #2, but now uses interrupted pilots as an additional safety feature, based on the experience gained from this explosion. Mr. Crouse, Maxon’s Vice-President, testified that the National Fire Prevention Association, Standard 86A on Industrial Ovens and Furnaces, provided for either a constant pilot or an interrupted pilot, the choice being left to the designing engineer. He also testified that the National Fire Prevention Association’s standards were used by insurance company engineers who approved installations for insurance purposes, just as Kaiser’s plans had been approved and insurance issued. We, therefore, do not find that the use of a constant pilot was negligence.
The purple peeper on HF #3 was focused so that it opened the Maxon Safety Valve if it detected either a pilot flame or a burner flame. Maxon claimed that this was negligence. Mr. Hopkins testified that in many instances the purple peeper is positioned to detect the point where the pi *866 lot light flame and the burner intersect. If there is a malfunction and the burner flame is extinguished by the gas/air mixture getting too rich with gas, the purple peeper would detect the pilot flame and keep the Maxon Safety Valve open, but the malfunction affecting the air/gas mixture would have occurred first. Maxon produced no evidence to contradict this testimony and, in fact, Mr. Crouse testified that if the Micro-Ratio Valve would admit more gas than necessary for the required setting, excess gas could pass by a flame and not be ignited.
Both Mr. Johnson, the operator, and Mr. Vicknair, the repairman working on HF #3 immediately prior to the explosion, testified that they saw the burner and that it was lit prior to the explosion. Therefore, both of Maxon’s theories concerning the pilot and the purple peeper are discounted as the burner was apparently lit and functioning normally immediately prior to the explosion, and neither the type of pilot nor the focus point of the purple peeper contributed to the accident.
The observation ports on HF #3 were four in number and Mr. Hopkins testified to their locations: (1) at the back of the pilot mixer to determine if the pilot was lit; (2) on the front of the burner mounting to see part of the inside tunnel of the burner; (3) on the right side of the air heater midway down its length; and (4), on the rear of the air heater to examine the combustion chamber and view the flame. Mr. Isaac, called by Thorpe as an expert mechanical engineer, testified that observation ports are not required by any code and that many furnaces do not have them. Therefore, we find no negligence in the design regarding observation ports.
Manometers are basically safety devices used for measuring the relationship of air or gas pressure to atmospheric pressure and hereby reflecting the air/fuel ratio of the furnace. A manometer is not a component necessary to operate the furnace, but is an additional check on the performance of the primary air/gas ratio measure and in no way affects its function. We find no fault in the basic design of the HF #3 generator or the safety factors built into it. Kaiser did not have to employ every safety feature possible and the absence of manometers does not constitute negligence.
The greater part of the evidence presented concerned the Maxon Micro-Ratio Valve, its design, its components, and the effect each had on the failure. Plaintiff, Kaiser and Thorpe alleged that the design of the valve was defective and that the components used did not meet Maxon’s specifications. Maxon claimed that it had exercised reasonable care in the design and manufacture of the valve, that there was no defect in the valve when sold, and that the past performance of the valve indicated that it was properly designed and manufactured.
The Micro-Ratio Valve was designed in 1942 and was basically the same in 1965 and had been used generally throughout the trade during that period with few known problems.
The valve consisted of a housing connected to the air butterfly by a mechanical linkage arm. Inside of the housing was an adjustable cam which actuated a plunger connected to an operating crank which controlled the gas butterfly. As the housing was moved from its minimum position the mechanical linkage provided a positive and visual control of the air butterfly. The flexible adjustable cam exerted a positive control on the plunger and gas butterfly while opening, but when pressure was released from the top of the plunger, the plunger was designed to be closed by the expanding pressure of the spring which the plunger rested on. The external operating connection was not connected to the plunger and did not exert any positive control on the plunger, assuring the closure of the gas butterfly. Visual observation of a malfunction was obstructed by the housing. The plunger was maintained in position *867 and guided by a bronze bushing which was designed to provide some lubrication of the plunger in addition to maintaining its course. The plunger designed by Maxon was stainless steel 0.498 ± 0.001 inches in diameter. The bushing was of a leaded bronze nature orginally with a bore of 0.-500-0.501 inches in diameter. Maxon had designed the plunger-bushing combination as a close tolerance, self-lubricating unit which would give good service.
There is no controversy concerning the fact that the plunger controlling the gas butterfly “froze” or “seized” in the bushing, allowing the gas butterfly to remain approximately 90% open. The controversy concerns the reason for and time of seizure.
The plunger and bushing contained in the HF #3 Micro-Ratio Valve when the generator exploded were tested for Kaiser by Shilstone Testing Laboratory, Inc. (Shilstone). Mr Bryan, Shilstone’s expert in metallurgical testing, found that the plunger was stainless steel with a 12% chromium content and not heat treated, being rated at a 92-94 rating on the Rockwell scale of hardness. The plunger was found to be a uniform 0.4974 inches in diameter after the removal of all foreign matter deposits, the deposits being: (1) a gray deposit of two layers measuring 0.-0007 inches between the middle and top of the plunger; (2) other light gray deposits of 0.0002 inches; and (3), a reddish deposit of 0.0003 inches. These deposits were chemically determined to be lead. The plunger surface was scratched longitudinally and was free of corrosion. The bushing was a highly leaded bronze-copper alloy. The inside diameter of the bore before removal from the housing was 0.5008 inches lower and 0.5007 inches upper. After removal each measurement increased 0.0001 inches. The bushing was much softer than the plunger, being rated at 68 on the Rockwellm scale of hardness and was considerably scored but not corroded.
Evaluation of the testimony of the experts testifying indicates that the plunger was of good material but not as suitable as if heat treated to increase its resistance to galling or frictional wear. Each expert had a different opinion of the suitability of the bushing’s hardness,: the annular space between the plunger and the bushing wall, and the effect that the interrelation of each had on the resultant seizure of the plunger in the bushing.
Mr. Bryan testified that the annular space between the plunger and bushing was insufficient and the small clearance had caused galling, “squeezing” the softer lead from the bronze in which it was impregnated. As a result of the squeezing the space between the two parts was filled with lead causing them to seize. He stated that the bushing was scored and the surfaces of both plunger and the bushing had similar lead deposits but that none of the deposits taken from the plunger and bushing and tested by Shilstone were of the same chemical components as flúor spar. He, therefore, concluded that the foreign matter or deposits on the plunger and bushing were from the bushing and not from the atmosphere or Kaiser plant area.
Mr. Crook, called by Kaiser as a mechanical engineering expert, testified that he found the bushing material too soft in relation to the plunger and for this reason subject to galling. He also was of the opinion that the annular space specified by Maxon was acceptable for a lubricated plunger in a clean surrounding but that the fit of the plunger and bushing was too close for a dry operation. He would have chosen an oil impregnated bronze for the lubrication effect or would have increased the diameter of the bushing bore.
Dr. Morfopoulos, the Technical Director of the American Standards Testing Bureau, Inc., was offered by the plaintiff as an expert in metallurgical engineering, and testified that the inner surface of the bushing of the exploded unit was pitted and evidenced a galling effect due to its being relatively soft. In an effort to correspond the readings of the two Rockwell scales, *868 “b” for the plunger and “m” for the bushing, he stated that the plunger hardness would be roughly 100 units harder than the bushing. Of three other bushings tested with the exploded one, he found them to be about 50 units harder and, for this reason, better suited for the installation. Dr. Mor-fopoulos found that the annular space between plunger and bushing could have been increased without interfering with the intended function and would have reduced the pressure on the bushing and the effect of foreign matter attaching to the plunger or bushing. An increased annular space would give better wear and the other bushings tested for comparison, including the bushing from HF #2, had an increased bore. Kaiser, after the explosion, enlarged the bore of its bushings to prevent future seizures. In his opinion, the plunger and bushing seized because foreign material became lodged in the close annular space, not because the force of the explosion drove the plunger into the bushing and driving the plunger out of the bushing would not create the same indications as galling.
Dr. Whitehouse, called as mechanical engineering expert by Maxon, classified the annular space between the plunger and the housing as a Class 1 fit, being the loosest fit accepted by the American Society of Mechanical Engineers, meaning that any parts designed for this unit would be interchangeable. The plunger-bushing combination was furnished by Maxon and the bushing diameter 0.502-0.503 inches, reamed after casting. This was the only plunger bushing tested and Dr. Whitehouse did not know how it compared to the damaged combination.
Dr. Albritton, called by Maxon as a mechanical and metallurgical expert, also examined a later model plunger-bushing combination in which the bushings inner diameter was enlarged.
Mr. Anderson, called by Maxon as an expert in metallurgical engineering, testified that he examined only two small samples of the damaged bushing. Normally a stainless steel plunger and bronze bushing would be acceptable but if the fit was too tight there would be a galling effect. He found the specifications used by Maxon for the manufacture of the plunger (0.498 inches ± 0.001 inches) and the bushing (0.-502-9.503 inches reamed) very adequate, being sufficiently close to allow a wiping or cleaning of the plunger and yet not too close to have contact. Although he stated that the bushing opening could be distorted by driving the plunger cap through, it could not be made smaller and that any deposit on the plunger in a close fit as here would create an added possibility for the normal operation to fail.
The lack of a positive control and inability to visually inspect the operation of the plunger controlling the gas butterfly was a design defect partially caused by the use of a spring to activate the closing of the gas butterfly. Although the Micro-Ratio Valve indicated a reduced gas flow when the housing was moved to a lower indicator mark on the scale, the gas butterfly would only close if the spring were able to overcome the resistance between the plunger and bushing. Dr. Morfopoulos tested the spring in HF #3 and found it to be 12% weaker than the spring taken out of HF #2 after four years of operation. Mr. Crouse acknowledged that the lack of spring pressure would allow the gas line to remain open.
Maxon emphasized the dirty conditions of Kaiser’s plant to show that it was an unreasonable location for its valve and the conditions were beyond those for which its use was intended, that Maxon did not know of these conditions in order to warn Kaiser and that no notice or warning was required to be given Kaiser, as Kaiser should have known of consequences of use under those conditions.
Maxon did not advertise or sell its Micro-Ratio Valve for a specialized installation under only certain specified conditions. It was sold for general usage, both indoors and outdoors. At the time Kaiser *869 specified the valve for HF #3, it had two other HF units containing Maxon valves which had operated without trouble for approximately four years. Mr. Crouse testified that Maxon could not caution each buyer as to all of the limitations of the valve for its intended use, because of the vast number of uses, locales, conditions, etc., possible. Maxon claimed that it could not have advised Kaiser on the use or maintenance of the valve under Kaiser’s plant conditions since Thorpe placed the order and did not inform Maxon of the intended location, use, conditions, etc. The valve was designed primarily for inside industrial plants and certain outdoor uses, but it was not suitable for outdoor use, especially without some protection from the elements. In spite of the intended uses by design, Maxon did not point out its designed limitations on use by either printed literature or instructions attached to the valve, in fact, as of the trial, Maxon had not printed any literature warning purchasers of the valve’s intended limited outdoor use. Mr. Crouse testified also that if Kaiser wanted to purchase another Mico-Ratio Valve now for use under the same conditions, Maxon would recommend that it not be used. Maxon did sell Kaiser a second Micro-Ratio Valve to replace the valve damaged in the explosion and it also stuck after two or three months use. Kaiser then sent Mr. LaCoste, its Superintendent of Maintenance Service, to Maxon’s plant to discuss the two failures and determine what could be done to prevent them. The valves on HF #1 and #2 were still working without difficulty under the same conditions as HF #3, and Maxon did not recommend their removal, although Maxon was then well aware of the conditions at Kaiser’s plant.
Maxon also alleges that Kaiser knew of the conditions at its plant and knew of the intended uses for the valve. Maxon alleges that Kaiser’s failure to have a preventive maintenance program, to include the Micro-Ratio Valve, was negligence for which Kaiser is liable and relies on the testimony of Kaiser’s employees to the effect that the flúor spar dust had covered pieces of equipment and caused failures of Micro-Ratio Valves to support this position. Although the cited testimony concerned the failure of Mico-Ratio Valves, the failure was not due to the plunger seizing in the bushing.
Mr. LaCoste testified that previous problems had been with corrosion on the mechanical linkage of the valve and had resulted in failure of operation of both air and gas, and was corrected by scraping off the corrosion and lubricating the linkage. Mr. Johnson also testified to the hang up of the external linkage but no internal malfunction. Although the general conditions of the Kaiser plant were not necessarily clean, they were conditions which would normally be expected in a plant such as this.
The trial court correctly ruled that Max-on was not entitled to indemnity from Kaiser and/or Thorpe as the result of their acceptance of a warranty printed on the reverse of Maxon’s invoice. Maxon could not prove receipt of the invoice by Thorpe or Kaiser. Even if Thorpe or Kaiser had noticed the warranty on the invoice, the law of Louisiana does not allow a unilateral limitation of a warranty. Under LSA-C.C. Arts. 2474-2476 the modification of the warranty would require knowledge and consent by the purchaser. In Harris v. Automatic Enterprises of Louisiana, Inc., 145 So.2d 335 (La.App.4th Cir. 1962), at p. 340, reviewed the applicable jurisprudence on warranty:
“In all Louisiana sales there is an implied warranty that the object sold is free of redhibitory vices, i. e. hidden defects. LSA-C.C. Art. 2475, 2476; Fisher v. City Sales and Service, La.App., 128 So.2d 790; Combs v. International Harvester Company, La.App., 115 So.2d 641; LSA-C.C. Art. 2520, 2530. Unless warranty is waived, the seller warrants the things sold as fit for the purpose intended. Beaird Co. v. Burris Bros., 216 *870 La. 655, 44 So.2d 693. Defendant relies upon the exclusion of warranty in the printed warranty on the reverse side of the invoice. Mrs. Band was the only one of the plaintiffs who signed the invoice, and she testified that her attention was never invited to the writing on the reverse side of the invoice, which was executed in multiple copies. Phillip J. Haverty admitted that he made no point of calling her attention to those provisions. We must conclude that the sale' or contract is reflected by the act of sale and chattel mortgage, dated May 28, 1959. The invoice is a separate and collateral document, the purpose of which was evidently to itemize articles and prices. Even if it is conceded arguendo that this invoice constitutes a material part of the sale and contract between the parties, we do not think that it compels the result suggested by defendant. This is further suggested by the fact that one of the plaintiffs was not required to sign the invoice but was required to sign the act of sale itself.
“An exclusion or waiver of warranty by which the parties make a law unto themselves is in derogation of the general law and should be construed strictly. Dufief v. Boykin, 9 La.Ann. 295. A stipulation printed on a letterhead, invoice, or other document furnished by one of the parties to a contract and not referred to in the contract itself or brought to the attention of the other party has no effect against him. Kodel Radio Corporation v. Shuler, 171 La. 469, 131 So. 462; Stracener v. Nunnally Bros. Motor Co. et al., 11 La.App. 541, 121 So. 617, 123 So. 911.”
The last area of error alleged by Maxon was the trial judge’s failure to use the special charges to the jury. Maxon requested 16 special charges, 14 of which were refused. After reviewing the special charges that the trial judge refused to give, we find no error in his refusal based on the contents of the record. Although not charged as Maxon requested, the jury and trial judge had the evidence forming the basis for the charges before it. Based on our findings concerning facts and liabilities in this case, the trial judge correctly refused to use Maxon’s charges and Max-on has not been prejudiced by this omission as the charges would not affect the ultimate conclusion.
For the foregoing reasons, we are in agreement with the jury’s finding that Maxon was negligent, and that its negligence was the proximate cause of the accident, and that all other parties were free of negligence. We, therefore, affirm the judgment concerning issues that remain on appeal before this court. All costs of this appeal are to be borne by Maxon and Camden.
Affirmed.