271 So.2d 56 (1972)
Mrs. Yvonne Pfister FREY, Individually, et al.
v.
TRAVELERS INSURANCE COMPANY et al.
No. 5184.
Court of Appeal of Louisiana, Fourth Circuit.
December 19, 1972.
Rehearing Denied January 15, 1973.
Writ Refused March 8, 1973.
Durrett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge, Talbot, Sotile & *57 Carmouche, Donaldsonville (Wallace A. Hunter, Baton Rouge, Vincent J. Sotile, Donaldsonville, of counsel), for plaintiffs-appellants.
Breazeale, Sachse & Wilson, Boris F. Navratil, Baton Rouge, Trial Atty., for defendants-appellees.
Before REGAN, BOUTALL and BAILES, JJ.
REGAN, Judge.
The plaintiff, Mrs. Yvonne Pfister Frey, individually, and as the duly qualified natural tutrix of her seven children filed this suit against the following defendants: Baldwin-Lima-Hamilton Corporation, the manufacturer of a crane in which her husband was killed; Boehck Equipment Sales, Inc., the vendor of the crane and the manufacturer's authorized area representative; eight individual employees of the Gulf Oil Corporation and the Travelers Indemnity Company, as the insurer of all the executive officers, directors, and stockholders of Gulf Oil.
The plaintiff is endeavoring to recover damages in the amount of $951,500.00 for the death of her husband which she insists was caused by the negligence of the defendants.
Innumerable pleadings and cross-pleadings were filed in response to the plaintiff's suit, the ultimate result of which was that the defendants, in the last analysis, denied the plaintiff's accusations of negligence.
After a trial on the merits, judgment was rendered in favor of the plaintiff, individually, in the sum of $80,000 and in favor of the plaintiff as natural tutrix of her seven children in the amount of $15,000 for each child.[1]
This judgment was rendered against four individual employees of Gulf Oil Corporation and the Travelers Indemnity Company.[2]
Judgment was also rendered dismissing the plaintiff's suit against Baldwin-Lima-Hamilton Corporation (hereinafter referred to for the purpose of brevity as BLH), Boehck Equipment Sales Company, Inc., and four of the individual defendants.
From that judgment plaintiff has prosecuted this appeal.[3]
The record discloses that the plaintiff's husband was employed by Gulf Oil Corporation at its Faustine Plant in St. James Parish, Louisiana. On September 9, 1968, he died as a result of injuries incurred when a metal basket in which he was working and which was supported by a wire cable attached to a crane commonly designated as a "cherry picker" fell to the ground. The petition alleged, and the plaintiff contends on appeal, that the death of her husband was caused by the functional failure of a socket or thimble into which the cable was inserted and which supported the metal basket attached to the crane.
When the accident occurred the defendant was in the process of installing polyethylene dust barriers in the plant's bulk storage building. The decedent and another employee were working in the metal basket which was suspended by a wire cable from the boom of the hydraulically operated *58 "cherry picker." The evidence adduced herein reveals that the combined weight of the basket and the two men working therein was approximately 1000 pounds and that the failure occurred when the basket was suspended from 18 to 20 feet above the ground.
The "cherry picker" which forms the subject of this litigation is a light and easily maneuverable crane, which may be driven from place to place similar to a truck. It possesses a telescoping boom which may be extended and retracted hydraulically, and there is also a manually operated extension housed inside the telescoping portion of the boom.
The load line on the crane consisted of a steel wire rope approximately 150 feet long. A substantial portion thereof is wound around a power-operated drum, which is controlled by the crane's operator. The line extends from the drum, through the telescoping boom over a sheave (commonly referred to as a block) at the extreme tip of the boom, thence makes a loop and terminates in a dead-end attachment at the boom tip. A load block is suspended from the bottom of the loop which hangs from the boom. Loads can be raised by reeling in the load line and thus shortening the loop of line suspended from the boom, by raising the boom, or by using a combination of both methods. The load line is fastened in a dead-end fashion to the tip of the boom by means of a special socket into which the wire line is fitted. It was the pulling of the line out of this dead-end socket which caused the metal basket to fall and fatally injure the plaintiff's husband.
Delivery of the "cherry picker" was made by the manufacturer to Gulf in March or April, 1968. In late May or early June of 1968, it was discovered that the cable attached to the "cherry picker" was frayed and otherwise damaged four to six feet from the point where it was inserted into the dead-end socket. A welder employed by Gulf, together with one of its maintenance mechanics, cut the cable with an acetylene torch one or two inches beyond the frayed section. The socket on the boom was heated and the old cable and filling which held the cable in the socket was removed. The inside of the socket and the end of the cable were then cleaned and the end of the cable was inserted into the socket. After this the component strands of wire were separated or frayed so that these strands flared out and followed the contours of the cone-shaped socket. The welder then used his torch to melt and fill the cavity of the socket with lead, and after the socket and its filling were cool it was reattached to the boom of the crane and tested satisfactorily. Subsequently, to reiterate, the fatal accident occurred in the manner set forth hereinabove, which resulted in the death of plaintiff's husband.
By spectrographic and chemical analysis it was verified that the substance used to fill the cone-shaped socket was more than 99% lead. An expert mineralogist and a metallurgist testified without contradiction that lead was an improper substance to use to fill the cavity of the socket for the reason that lead and steel (of which the wire was composed) do not possess the necessary properties to alloy and form an intermetallic bond. Each expert testified that the proper substance to use in order to secure the steel wire in the cone-shaped joint was zinc, which possesses properties which permit it to alloy and form a bond or joint which would have been approximately 100% safe.
The plaintiff contends in her counsel's brief that there exists no justification emanating from the record for any assumption other than the fact that the fatal accident was caused by the failure of the cable socket and that this failure was due entirely to the use of lead rather than zinc as a filler in the socket. She also contends that BLH, as the manufacturer of the crane owed two obligations to the users of its product, the first being the duty to give adequate instructions for the use and repair *59 of the product and the second being a duty to warn of dangers inherent therein.
The defendant, on the other hand, insists, and we must agree, that the foregoing elucidation reveals that this is not a products-liability case, as such, since it does not involve the failure of a product as originally manufactured by the defendant. The portion of the crane which failed in this case was not in fact manufactured by the defendant, BLH, but it was repaired by the employees of Gulf Oil Corporation. The primary jurisprudence upon which the plaintiff relies[4] both involve a manufacturer's responsibility to warn against dangerous qualities of its product under conditions where the product was intended for use and was in fact used in the condition in which it was originally manufactured when its failure occurred. These authorities do not, however, apply to the facts posed for our consideration. We agree that liability may be imposed on a manufacturer when a failure occurs in the process of a foreseeably dangerous use of its product as manufactured. However, it is impossible to place upon a manufacturer of a product the obligation to warn against conceivably defective repairs to its product made by third persons. These repairs could be made in an infinite number of ways, and it is relatively impossible for a manufacturer to anticipate all of these methods of defective repair and to warn against them. Thus the distinction becomes quite obvious in this case, in that by the plaintiff's own admission the cable pulled out of its socket and her husband's death was caused by the intervening act of third persons in making defective repairs to a part of the crane manufactured by the defendant. It is clear that a significant part of the crane did not fail as a result of the negligence of the manufacturer, but only failed after the intervention of an independent cause. Hence, the conclusion is inevitable that the defendant is not liable for the failure of its product in view of the facts adduced herein.
For the foregoing reasons, the judgment of the lower court is affirmed. The plaintiff is to pay all costs incurred herein.
Affirmed.
NOTES
[1] One of these children married during the pendency of the litigation, and the $15,000 award was made to her personally.
[2] Judgment was also rendered in favor of Travelers Insurance Company, as the workmen's compensation insurer of Gulf Oil, reimbursing it for all payments made by it under the Louisiana Workmen's Compensation Law.
[3] Appeals were also taken by two of the individual defendants, The Travelers Indemnity Company and the Travelers Insurance Company. However, because of a restrictive settlement agreement entered into between these parties and the plaintiffs, the only issue before this court is the liability vel non of BLH.
[4] Oubre v. Maxon Premix Burner Company, La.App., 232 So.2d 861 (1970), and Penn v. Inferno Manufacturing Corporation, La.App., 199 So.2d 210 (1967).