351 So.2d 1238 (1977)
Mrs. Gladys Marie C. DAVIS et al., Plaintiffs-Appellants,
v.
RELIANCE ELECTRIC COMPANY et al., Defendants-Appellees.
No. 11402.
Court of Appeal of Louisiana, First Circuit.
October 17, 1977.
Rehearing Denied November 21, 1977.
Johnnie A. Jones, Baton Rouge, of counsel, for plaintiffs-appellants Mrs. Gladys Marie C. Davis et al.
Harmon Roy, Lafayette, of counsel, for defendants-appellees Reliance Electric Co., et al.
Daniel R. Atkinson, Baton Rouge, of counsel, for defendants-appellees Pittman Const. Co. and Aetna Cas. & Sur. Co.
A. G. Seale, Baton Rouge, of counsel, for defendants-appellees United Elevator Co., and Continental Cas. Co.
Lee C. Kantrow, Baton Rouge, of counsel, for defendant-appellee Nolan, Norman & Nolan Continental Cas. Co.
Allen Danielson, New Orleans, of counsel, for intervenor-appellant Houston Gen. Ins. Co.
Emile C. Rolfs, III, Baton Rouge, of counsel, for defendants-appellees Montgomery Elevator Co. and Employers Commercial Union Ins. Co.
Before SARTAIN, COVINGTON and LOTTINGER, JJ.
SARTAIN, Judge.
In this wrongful death action, the surviving widow, Mrs. Gladys Marie C. Davis, and major children, Sheryl Lyn Davis and George R. Davis, of George C. Davis (decedent) *1239 appeal from an adverse jury verdict. We affirm.
On November 30, 1971, decedent suffered fatal injuries in an elevator shaft at Jones Hall on the campus of Southern University at Baton Rouge, Louisiana. On that date and at all times pertinent to this litigation decedent was employed by the University as a custodial janitorial employee at Jones Hall, a dormitory for male freshmen.
The defendants are Pittman Construction Co., Inc. (Pittman), the contractor of Jones Hall; Nolan, Norman & Nolan, (architects); Haughton Elevator Co. (Haughton), the manufacturer-installer of the elevator; United Elevator Co. (United), a coinstaller of the elevator; Montgomery Elevator Co. (Montgomery), maintenance contractor of the elevator; and, the liability insurers of the above.
Houston General Insurance Company, Southern's workmen's compensation insurer, intervened for sums paid to decedent's widow.
The jury, as evidenced by its response to the interrogatories, found that each of the above named defendants was without fault. As a consequence of these initial determinations, the jury did not have to address itself to the issues of contributory negligence or assumption of risk on the part of the decedent.
Appellants on appeal contend that the verdict of the jury is "contrary to the law and evidence and in utter disregard" of the trial court's charge to it with respect to the duty owed to the decedent under the theories of products liability as to the manufacturer and traditional negligence as to the remaining defendants. Further, they urge that inasmuch as there were no eyewitnesses to the accident, a presumption of due care rests with the decedent and that defendants have failed to rebut there (appellants') prima facie showing of a defect in the elevator and negligent conduct in its maintenance.
Jones Hall is a six-story building which is serviced by two automatic elevators. These elevators are located parallel to one another. One was used by the students and the other was used almost exclusively by custodial or janitorial personnel. The latter elevator was not in use; it was kept locked. The subject accident involved the student elevator.
By way of background information, it should be noted that in compliance with the National Elevator Safety Code, the elevator doors at the first and sixth floors were each equipped with a latching device which permitted the door to be manually opened to gain access to the pit and to the top of the elevator in each shaft. The latch is operated by a device called a lunar key which is inserted through a small hole near the top of the door. This hole is covered by an "escutcheon plate" which is about the size of a nickel. The key is inserted through the escutcheon plate and triggers a release mechanism which then permits the door to be opened manually. Access to the elevator shaft in this manner is essential for necessary repairs and fire protection. Considerable portions of the record concern the absence of an escutcheon plate on the date of the accident, the general use and operation of the student elevator.
The testimony reveals that the elevators were accepted in the latter part of September, 1969, at which time they were found to have been correctly installed and working properly. For the following six months, Haughton and United were responsible for its routine maintenance and inspection. Thereafter and up to the time of the accident, Southern had a contract with Montgomery for the maintenance and required inspections of the elevators.
The student elevator was the source of constant concern. The record is replete with evidence as to its misuse and abuse by students. During the first six to nine months of its operation, Southern expended between $3,000.00 and $4,000.00 to repair damage inflicted by students. Push buttons on the various floors were missing. There were times when naked wires were evident. Lights were removed. A burning trash can was placed in one and it was started on its way. Students would use the *1240 emergency switch to stop the elevator and leave it with the warning bell ringing. This occurred so frequently that at times the custodial personnel would pay no attention to the alarm. Apparently, notices and directives from the University served little or no useful purpose for this practice continued in similar fashion up to the date of the accident.
On many occasions, the student elevator would stop between floors. Personnel from the University would open the doors at either the first or sixth floor level to determine its location. They would then go to the "penthouse" and manually "jack-up" the elevator to the nearest floor so the passengers could exit.
For some time prior to the date of the accident, the escutcheon plates had been removed. In lieu of the lunar keys, a pencil or screwdriver would be used to trip the latch so as to permit the opening of one of the doors. The door having been opened in this manner, the attendant would then look into the elevator shaft to determine where the elevator had stopped. This eliminated the necessity of going from floor to floor.
Decedent was familiar with this procedure and had often engaged in the same.
Personnel from defendants stated that it was unwise to follow this procedure and that they had not sanctioned it. Witnesses for plaintiffs stated that they were instructed in this procedure by Van J. Gaudin, an employee of Montgomery.
On the day of the accident Flanders Hall, a cocustodial employee of decedent, was told that Davis was in the elevator shaft. He went to the sixth floor and opened the door of the student elevator with the aid of a pencil and in the manner outlined above. He saw that decedent was on top of the elevator with his body wedged in between a counterweight and a cable. The top of the elevator was then located some six to eight inches below the fifth floor level. He then went to the roof and manually operated the controls to release the weights. He assisted in removing decedent and carrying him to the first floor. Decedent had not lost consciousness and told Hall, "that he (Davis) was looking for the elevator to see where it was located at and slipped and fell into the shaft." There were no occupants in the elevator itself. It was later determined that the cause of the stoppage on this particular occasion was "blown fuses . . ." in the ". . . main line power switches."
Turning now to the proof of support and allegations seeking to impose liability on the various defendants, we note a complete absence of any creditable evidence with respect to the building contractor (Pittman) and the architects (Nolan, Norman & Nolan).
With respect to Haughton, plaintiffs seek to impose liability on the basis of a defect in the elevator itself under the theory of products liability. To be successful, plaintiffs must prove (1) a defect in the elevator, (2) that at the time of its failure it was in normal use, (3) that it was unreasonably dangerous in that use, and (4) that the defect caused the injuries. Weber v. Fidelity & Casualty Insurance Co., 259 La. 599, 250 So.2d 754 (1971); Dixon v. Gutnecht, 339 So.2d 1285 (La.App. 1st Cir. 1976), writ denied, 342 So.2d 673 (La.1977).
Plaintiffs argue that the repeated failures of the student elevator over a period of two years is sufficient to show that the elevator itself was defective.
Defendants contend that these repeated failures were the consequences of the constant abuse the elevator was subjected to by the student residents, who "systematically destroyed" the elevator equipment. If this latter contention be correct, it cannot be said that the subject elevator was or had been in normal use at the time of its failure, a prerequisite to liability, noted above. Frey v. Travelers Insurance Co., 271 So.2d 56 (La.App. 4th Cir. 1972), application denied, 273 So.2d 840 (La.1973); Annot., 41 A.L.R. 1253.
In any event, the question is one of fact to be resolved by the jury based on the evidence presented by each of the parties in support of their respective claims. We find *1241 no manifest error in the result reached by the jury which undoubtedly concluded that the noted failure resulted from student abuse. Perrin v. St. Paul Fire & Marine Insurance Co., 340 So.2d 421 (La.App. 4th Cir. 1976).
The remaining issue, that is the liability of Montgomery based on its failure to properly maintain and service the elevator, centers on the absence of the escutcheon plate and the legal consequences flowing therefrom. It is conceded by Montgomery that its absence should have been noted and that plate replaced immediately. However, Montgomery strongly argues that the absence of the plate was not a cause in fact of the accident. They contend that the half moon opening in the plate was to restrict access to the latching device to the use of the lunar key. They point out that even with the plate in place, the device could still be triggered with a thin screwdriver or a wire coat hanger. Further, that the lunar keys were furnished to university personnel for emergency use and that had Davis desired a key he could have obtained one from the office.
We note that the record stands uncontradicted to the effect that when the latching device is triggered the door can only be opened by force and will remain open only when held open. When the door is released, springs attached to its back side will force it to close. Graphic proof of this is the fact that when Davis was discovered by Hall the door was closed.
We find no manifest error in the jury's determination that Montgomery was free from fault under the particular facts noted above. Perrin v. St. Paul Fire & Marine Insurance Co., above. Stated another way, we like the jury find that the absence of the escutcheon plate was not a cause in fact of the accident. In considering the extent to which legal consequences flow from an alleged act of negligence, the Supreme Court in Hill v. Lundin & Associates, Inc., stated: (260 La. 542, 256 So.2d 620 at 623)
". . . The same policy considerations which would motivate a legislative body to impose duties to protect from certain risks are applied by the court in making its determination. `All rules of conduct, irrespective of whether they are the product of a legislature or are a part of the fabric of the court-made law of negligence, exist for purposes. They are designed to protect some persons under some circumstances against some risks. Seldom does a rule protect every victim against every risk that may befall him, merely because it is shown that the violation of the rule played a part in producing the injury. The task of defining the proper reach or thrust of a rule in its policy aspects is one that must be undertaken by the court in each case as it arises. How appropriate is the rule to the facts of this controversy? This is a question that the court cannot escape.' Malone, Ruminations on Cause-In-Fact, 9 Stanford L.Rev. 60, 73 (1956)."
See also: Robertson: Reason Versus Rule in Louisiana Tort Law, Etc., 34 L.L.Rev. 1 (1973).
Finally, we must reject plaintiffs' contention that the instant controversy, both as to the law and the facts, "is on all fours" with Barnett v. Trinity Universal Insurance Company, 286 So.2d 770 (La.App. 2d Cir. 1973), writ refused, 287 So.2d 528 (La.1973). We do not find that plaintiffs established a prima facie case of negligence. In Barnett, the court found, both originally and on rehearing, that the elevator door did not contain an automatic locking device and more particularly, that the door when pushed open would remain open. At issue was the operation of a manually-operated elevator without an operator, where the elevator shaft could be left exposed without "modern safety devices." Such are not the facts in the case at bar. While we recognize the rule that absent any evidence to the contrary a person is presumed to have acted with due care, Barnett, above; Gant v. Aetna Casualty & Surety Co., 234 So.2d 776 (La.App. 1st Cir. 1970), certiorari denied, 256 La. 736, 236 So.2d 503 (1970); Finn v. Employers Assurance Corporation, 141 So.2d 852 (La.App. 2d Cir. 1962); the absence of an eyewitness to an accident *1242 does not in and by itself establish a prima facie case of negligence against an alleged tort feasor. The presumption may well, and it often does, inure to the benefit of an injured decedent but this generally is in defense of a claim of contributory negligence.
Accordingly, for the above reasons, the judgment of the district court is affirmed at appellants' costs.
AFFIRMED.