702 So.2d 976 (1997)
Magdalena EARHART and Succession of Mitchell S. Earhart
v.
Gregory G. BROWN and Jeffrey G. Brown.
Magdalena L. Earhart GROOME, Individually and as the Administratrix of the Succession of Mitchell S. Earhart
v.
G. BROWN, Jeffrey G. Brown, Brown's Enterprises, Tanknology Corporation International, Rittiner Equipment Company and Beacon Enterprises, Inc. and W.F. Breland, Sr.
Nos. 97-CA-522, 97-CA-523.
Court of Appeal of Louisiana, Fifth Circuit.
October 28, 1997.
*977 Santo A. Dileo, New Orleans, for Plaintiffs In Reconvention/Appellants Gregory G. Brown and Jeffrey G. Brown.
*978 Ferdinand J. Kleppner, Metairie, for Movers In Rule/Appellees Magdalena Earhart and Succession of Mitchell S. Earhart.
Before GAUDIN, C.J., and GOTHARD and CANNELLA, JJ.
GOTHARD, Judge.
Defendants, Jeffrey and Gregory Brown, appeal an adverse ruling in the trial court which ordered their eviction from leased commercial property owned by the plaintiffs, Magdalena and Mitchell Earhart. For reasons that follow, we affirm.
The record shows that the Earharts owned and operated a Phillips 66 service station located at 3801 Airline Highway until 1988, when because of illness, they decided to lease the station to the Browns. The 1988 lease was for a term of two years. At its expiration in 1990, the lease was renegotiated and renewed for a term of eleven years at a monthly rental of $2083.33.
The Browns successfully operated a gas station and an auto repair shop on the premises until January 4, 1995, at which time a flex hose on the dispenser for one of the underground tanks malfunctioned, causing the release of 750 to 1000 gallons of gasoline into the soil and the sewer system. The leak initially went undetected because a leak detector on the hose was improperly installed. After the leak was discovered, the Browns changed the flex hose and installed the leak detector properly.
Such incidents are investigated by the Department of Environmental Quality (DEQ), which ordered a site assessment report. The Earharts engaged the firm of Burk-Klienpeter for that purpose. As a result of the leak and information received subsequent to the leak, DEQ shut down the gas dispensing operations of the station on March 1, 1995. That action resulted in about a 50% reduction in business for the Browns, who now only had the auto repair and used cars sales portion of their business operational.
Because the underground gasoline storage tanks were not in conformance with DEQ regulations, all had to be removed. Three tanks located in the front of the station, two 6000 gallon steel tanks and one 8000 fiberglass tank, were removed. However, the smaller waste storage tank in the rear of the property is still in place. At the time of trial, the Browns were still repairing and selling used cars on the property, although they were no longer able to sell gasoline.
The Browns did not pay the $2083.33 rent for the month of March, 1995. On March 31, 1995, the parties met to discuss the situation. At that meeting there was some agreement for a reduction in rent, although the conditions and duration of that agreement are in dispute. The Earharts were represented at the meeting by their daughter, Mardel Groome[1], who testified at the hearing that rent was set at $1500.00 per month. Ms. Groome stated that she agreed to a reduction in rent out of consideration of the plight of the Browns. The $1500.00 figure was decided upon because the mortgage on the property was $1200.00. Thus, the $1500.00 figure would cover the cost of the mortgage and the real estate management fee. Later, when it became apparent that the tanks would have to be removed and the Browns would be unable to dispense gas for a longer period of time, the rent was reduced to $750.00. Ms. Groome testified she was able to reduce the rent because she convinced the mortgage company to temporarily accept interest only payments which amounted to $600.00. She was adamant that the rent for March and April was set at $1,500.00 and the reduction to $750.00 was only for the months of May, June and July.
Gregory Brown testified that he was told at the March 31st meeting the rent for March was past due. He stated that he told Ms. Groome he could only afford $750.00 per month, and she agreed to reduce the monthly rent to that amount beginning with the March, 1995 rental. The Browns paid $1,500.00 in April to cover the rental for *979 March and April. In May, June and July the Browns sent $700.00 per month.[2]
On June 26, 1995, counsel for the Browns sent a demand letter to the Earharts demanding repair or replacement of the tanks. On July 25, 1995, the Earharts sent a letter to the Browns informing them that the contaminated soil had been replaced and that DEQ would not allow automobile work or storage of vehicles which may possibly leak fluids over the new soil. The letter also informed the Browns that access to the underground storage tank in the rear of the property would be needed by the Earharts' contractors in order to remove the tank to complete decontamination of the site. The record shows that the storage tank, which is referred to in this letter and still remains, is on the back of the property, and was inaccessible to the contractors because it is the area the Browns use to store and repair old cars. The letter further advised the Browns of DEQ requirements regarding the weekly pumping of wells.
On July 31, 1995, Robert Talbot, the Earharts' real estate manager, sent a letter to the Browns requesting $1500.00 for payment of the March, 1995 rent, and $150.00 extra in rent for the months of May, June and July. The letter indicates that the $1500.00 paid in April was accepted as the April rental. The $150.00 was paid by the Browns, but the $1500.00 due for March was not. Nor did the Browns remove the obstructions to allow the contractor to remove the storage tank.
On September 20, 1995, counsel for the Earharts sent a demand letter to the Browns to which the Browns did not respond. On November 2, 1995, the Earharts filed this rule to evict. In the rule to evict, the Earharts allege that the Browns have violated the terms and conditions of the lease in that:
1. They have consistently failed to make rental payments in a timely manner;
2. They have failed to pay any rental for the months of March, 1995, and August, 1995, and have paid only a portion of the monthly rental for the months of September and October, 1995;
3. They have failed to produce evidence that they have caused storage tanks to be tested on a yearly basis in accordance with the requirements of Department of Environmental Quality Regulations;
4. They have failed to produce evidence of compliance with Department of Environmental Quality Regulations pertaining to required testing of gas lines and pumps;
5. They have failed to provide all repairs and maintenance for the leased site, including tanks, storage tanks and pumps.
The Browns answered the rule to evict with a general denial and asserted the following affirmative defenses:
1. That the Earharts have waived their right to assert untimeliness of rental payments due to their acceptance of the routinely late payments for the past seven years.
2. The reduced rentals paid after the January, 1995 spill were by agreement of the parties.
3. The Browns met their obligation by causing the tanks to be tested in 1991 and giving the report to the Earharts.
4. There was insufficient notice of lease violations before the rule to evict was filed.
In the alternative, the Browns request a credit and set-off against the rent owed for replacement of the roof on the premises. The Browns also made a reconventional demand for damages based on claims of breach of contract, negligence, and strict liability.
The claims made in the reconventional demand were severed, and a hearing was held on the rule to evict and the affirmative defenses to it, after which the trial court rendered judgment in favor of the Earharts, evicting the Browns from the premises. The Browns appeal that judgment.
The lease, introduced into evidence by both parties, is a commercial lease with an eleven year term commencing on October 1, 1990 and terminating on September 31, 2001. The lease is a standard pre-printed commercial property lease to which the parties have *980 added certain clauses. It is that added portion, reprinted below, which is relevant to our inquiry here:
Lessee to be responsible for all repairs and maintenance.
Lessee may purchase the property at any time by giving Lessor ninety (90) days written notice. The purchase price will be as follows:

 Years 1-2: $160,000
 Years 3-5: $175,000
 Years 6-10: Average of three appraisals
 but no less than $175,000.

In the event of purchase by Lessee, Lessee(Purchaser) accepts the property "as is" and Lessor does not make any warranty, express or implied, about the conditions or fitness of the property including particularly any environmental conditions, past, present, or future, which matters shall be the sole responsibility of Lessee. Lessee acknowledges that he has made his own independent investigation of the property and is relying solely on such independent investigation of the property and acknowledges that Lessor has no expertise concerning environmental matters or requirements and that Lessee is not relying on any representation, or lack of same, by Lessor as they apply to the property. Lessee unconditionally releases Lessor from any and all liability past, present, present, or future, both known and unknown, present and future, for any environmental release or damage arising out of use of the property, including particularly use of the underground storage tanks and related appurtenances, whether or not caused by the negligence of Lessor.
A rental credit of 5% of the gross rent will be applied towards the purchase price in years 3-5. A rental credit of 10% of the gross rent will be applied towards the purchase price in years 6-11.
Lessor to pay all taxes on the subject property.
Lessee to assume complete responsibility for the gas tanks and pumps. Lessee agrees to adhere to all Louisiana DEQ and to all EPA requirements concerning maintenance and testing.
The Browns assign eighteen assignments of error in brief to this court. In the first assignment, they argue that the trial court erred in its refusal "to honor its January 25, 1996 order to try the Browns' reconventional demand except for damages with the rule to evict". The Browns argue that the trial court agreed, at a pre-trial conference, to try the reconventional demand, "less the damage portions", with the rule to evict. At the hearing on the rule to evict, the trial court heard only the rule to evict and the affirmative defenses to the rule. It did not allow the Browns to introduce evidence regarding the reconventional demand. We find no error in that ruling.
La.C.C.P. art 1036 B states "(t)he mode of procedure employed in the incidental demand shall be the same as that used in the principal action, except as otherwise provided by law". A rule for eviction is tried summarily in accordance with La.C.C.P. art. 4731 et seq. Consideration of the reconventional demand, which asserts claims for damages due to breach of contract, negligence, and strict liability, must be conducted by ordinary procedure. La.C.C.P. art. 851 et seq. Therefore, we see no error in the trial court's decision to try the eviction separate from the reconventional demand. The trial court retains jurisdiction over the reconventional demand. La. C.C.P. art. 1038. Accordingly, the assignments of error regarding the admission of testimony on the reconventional demand will not be addressed in this opinion.
In the next nine assignments of error the Browns contest various evidentiary rulings of the trial court on admissibility of testimony and documents. The Browns raise questions of relevancy of the evidence.
La.C.E. art. 401 provides that relevant evidence is that evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence". La.C.E. art. 402 provides that relevant evidence is admissible. The trial court is vested with wide discretion in determining relevancy of evidence and its ruling will not be disturbed on appeal absent a showing of manifest abuse of *981 that discretion. State v. Miles, 402 So.2d 644 (La.1981).
The Browns object to the admission of a letter dated May 16, 1990, and an appearance evaluation sent from Phillips 66 to the Browns which outlined violations of company standards at the station. They assert the documents are irrelevant since the lease in question did not commence until October 1, 1990, and because no such violation is mentioned in the September 20, 1995 demand letter or the rule to evict. Finally, they argue the documents represent inadmissable hearsay evidence.
The documents were admitted during plaintiffs' cross-examination of Mr. Gregory Brown. Defendants timely objected to questioning on the documents, arguing it was irrelevant to a consideration of whether a violation of the terms of the lease occurred since the letter was written and received before the lease was confected. Defendants also argued that to allow the introduction of this documentary evidence would, in effect, enlarge the pleadings.
Plaintiffs argue the documents are admissible because they show a recurring pattern of failure to maintain the premises in accordance with the terms of both the 1988 and the 1990 lease. It is clear that failure to maintain the premises is one of the allegations contained in the rule to evict. While this documentary evidence is marginally relevant to the matter at hand, to fully review the ruling for manifest error we must consider it in conjunction with a subsequent ruling made by the trial court and complained of by the Browns. That ruling is the refusal to allow the Browns to introduce the 1988 lease into the record.
After the above documents were introduced over counsel's objection, the Browns attempted to introduce the 1988 lease to show that the provisions were different than those in the 1990 lease. The Earharts objected on the ground that the earlier lease is not relevant, and a copy of the lease was not provided to the Earharts in discovery. The trial court refused to admit the 1988 lease, but allowed the Browns to proffer the lease. We believe that once the trial court ruled the letter and evaluation from Phillips 66 were marginally relevant, a decision in which we find no manifest error, the trial court erred in not allowing the 1988 lease to be admitted. We accept the proffer of the lease and consider it admitted.
The Browns assert that the trial court should not have allowed cross-examination of the Browns about the removal of cars because the failure to remove cars is not a violation of the lease. The Earharts argue that this evidence is relevant to the issue of cooperation and compliance by the Browns with DEQ. We find that argument convincing and see no manifest error in the trial court's ruling allowing the testimony. It is evident from the record that the Browns had adequate notice that storage of cars over a waste storage tank in the rear of the property which had to be removed pursuant to DEQ orders impeded the completion of the decontamination process. Although they assert they moved some of the cars, they acknowledge that some still remain. One of the clauses contained in the lease agreement places responsibility on the Browns for adhering to DEQ requirements. Thus, we believe the testimony was relevant in consideration of whether the Browns were in violation of that clause.
The Browns also object to testimony of alleged lease violations prior to October 6, 1995 on the ground that they precede notice of a lease violation. The lease contains a clause which allows the lessor to bring the evictions action, "(s)hould the lessee at any time violate any of the conditions of this lease.....and should the violation continue for a period of fifteen days after written notice had been given Lessee....." the Browns contend that since the first notice of lease violations was sent by letter dated September 20, 1995, violations prior to the fifteenth day after notice was given cannot be considered.
The Browns' argument fails to recognize the demand letter written on July 31, 1995 by Robert Talbot, the real estate agent who managed the property. The Browns contended at trial that letter should not be considered valid notice because it did not come directly from the lessor. We find nothing *982 in the lease which discounts written notice sent from an authorized agent of the lessor. Consequently, we find no merit in this argument.
The Browns argue that the trial court erred in refusing to allow cross-examination of Robert Talbot on his knowledge of DEQ regulations. They contend that the testimony was relevant to show the lessor's knowledge of DEQ regulations. Even assuming arguendo this testimony is relevant to the lease, Mr. Talbot was not qualified as an expert on DEQ regulations and, further, it would be inappropriate for him to testify to what the lessor knew of these regulations. We find no error in the trial court's ruling in this regard.
The Browns also attempted to question Mr. Talbot on the meaning of the phrase "lessee to be responsible for all repairs and maintenance". The Browns argue the testimony was relevant to understand whether the clause was broad enough to include replacement of the underground tanks. Mr. Talbot is the real estate manager and not a party to the lease. The trial court ruled such testimony is improper and we agree. The interpretation of the lease is a matter for the trial court. Mr. Talbot's opinion on the meaning of that clause is immaterial.
They also argue Mr. Talbot's testimony was relevant to shed light on objective factors used by the agent for the reduction of monthly rental payments. It is appellants' contention on appeal that the reduction in rent is directly related to the square footage in actual use after the spill. However, Gregory Brown's testimony belies this argument. It is clear from his testimony that he told Mardel Groome at the March 31, 1995 meeting that he could only pay $750.00 because he could no longer pump gas. He stated the reduction in rent was based on what he could afford to pay. There is no mention in Mr. Brown's testimony that the reduction in rent was related to square footage used. Thus, we are not convinced by this argument.
Appellants also sought to question Dennis Groome, husband of Mardel Earhart Groome, about discussions between the Earharts and the Browns regarding the reduction of rent. By using this testimony, the Browns sought to explore the intentions of the parties concerning the reduction of rent. Further, they wished to use the testimony to support their claims stated in reconvention. Because we have previously determined that the reconventional demands must be heard separately, we decline to discuss the latter argument.
As to the use of Mr. Groome's testimony in support of the intention of the parties for the reduction of rent, we find no error in the trial court's ruling. Although Mr. Groome was present at the meeting, he is not a party to this lease. There is sufficient testimonial and documentary evidence from the parties to decide this issue. Under these circumstances, the refusal of the testimony of a non-party is not error.
Assignments numbers nine and ten concern exclusion of evidence on the reconventional demand and, for reasons already discussed infra, will not be addressed herein.
In assignment number eleven the Browns argue the relevancy of testimony of Gregory Brown as to his experience in renting a gas service station in the area previous to the signing of the two lease agreements on the property at issue herein. The Browns attempted to elicit the testimony to show a basis for the reduction in rent. As previously discussed, Mr. Brown testified that he offered the figure of $750.00 in rent after the spill because it was what he could afford to pay. We see no error in the trial court's ruling that this testimony was irrelevant.
The remaining assignments address issues of lease interpretation and the finding that the Browns were in violation of those terms, warranting eviction.
The law with regard to leases is clearly established, and was recently set out by this court in Edenborn Partners v. Korndorffer, 94-891 (La.App. 5 Cir. 3/1/95), 652 So.2d 1027, at 1030; writ denied, 95-1234 (La.6/23/95), 656 So.2d 1032:
The codal articles and statutes defining the rights and obligations of lessors and lessees are not prohibitory laws which are unalterable by contractual agreement, but are simply intended to regulate the relationship *983 between lessor and lessee when there is no contractual stipulation imposed in the lease. Tassin v. Slidell Mini-Storage, Inc., 396 So.2d 1261 (La.1981). All things not forbidden by law may become the subject of or the motive for contracts. Tassin v. Slidell Mini-Storage, Inc., supra. Agreements legally entered into have the effect of law on those who have formed them and the courts are bound to give legal effect to such agreements according to the true intent of the parties. La C.C. art.1983; Tassin v. Slidell Mini-Storage, Inc., supra; Versailles Arms Apartments v. Pete, 545 So.2d 1193 (La.App. 4th Cir. 1989).
In making the determination that the Browns underpaid the rent, and were in breach of lease clauses by failing to uphold their responsibility for compliance with DEQ regulations, the trial court stated in reasons for judgment:
The Court found the testimony of Mardel Groome particularly credible. Ms. Groome testified that both of her parents were cancer patients at the time the lease was negotiated. She further testified that her parents did not have the funds to maintain the premises in question or to be responsible or liable for any damages that would result from failure to comply with regulatory requirements or for contamination or cleanups that might be cause by petroleum spills. Ms. Groome testified that she insisted that a provision be placed in the lease specifically excepting her parents from responsibility for such things. In exchange, Ms. Groome testified that the Browns were granted an exceptionally long-term lease which contained provisions allowing them to purchase the property and providing them long and extended periods to obtain financing to accomplish such a purchase. The Court believes this was a bargained for, arms length transaction.
In assignments numbers twelve and thirteen the Browns argue that the trial court erred in evicting them for nonpayment of rent. The Browns admit their failure to pay rent timely for seven years prior to this eviction proceeding, but contend that the acceptance of the consistently late payments estop the Earharts from asserting untimely rent payments as a ground for the eviction. In support of their contention, the Browns cite Versailles Arms Apartments v. Pete, 545 So.2d 1193 (La.App. 4 Cir.1989). In Versailles the court found notice, given a tenant before eviction for untimely payment of rent, was insufficient where the tenant was in a rent assistance program governed by federal regulations. In that case the tenant, who received her assistance check on the fifth of the month, consistently paid after the fifth of the month, although the lease contract called for rent payment on the first. A ten day notice of eviction was given to the tenant after the fifth of the month and the trial court evicted the tenant. In its review and reversal, the Fourth Circuit held the notice was insufficient, finding that "it is inequitable to allow a lessor to mislead or lull a tenant into a false sense of security by accepting late rent payments for an extended period, without demand for punctuality, and then on a future date of his own choosing, cancel the lease for nonpayment of rent." Versailles, supra at 1194.
We find the Browns' reliance on Versailles is misplaced. Eviction in the case at bar resulted, in part, from nonpayment of the March rent. Notice that the March rent was unpaid was given on July 31, 1995. That letter also informs the Browns of the partial payments for the May, June and July payments. Which they acknowledge were less than the $750.00 agreed upon by the parties.
It should also be noted that the terms of the lease provide that:
Failure to strictly and promptly enforce these conditions shall not operate as a waiver of Lessor's rights, Lessor expressly reserving the right to always enforce prompt payment of rent, or to cancel this lease, regardless of any indulgences or extensions previously granted. The receiving by Lessor, or Lessor's representative of any rent in arrears, or after notice or institution of any suit for possession, or for cancellation of this lease, will not be considered as a waiver of such notice of suit, or of any of the rights of Lessor.
*984 We find the above cited clause in the lease agreement to be valid and decisive of the issue herein.
The Browns also argue that the trial court erred in accepting Ms. Groome's testimony as credible in regard to the issue of rent reduction.
It is function of trier of fact, and not that of appellate court, to assess credibility of witnesses. State v. Lawson, 614 So.2d 789 (La.App. 2 Cir.1993). While the Courts of Appeal are constitutionally mandated to review the facts of a case, the applicable standard for such a review is the manifestly erroneous or clearly wrong standard. Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216. In applying this standard our inquiry is not whether this court may have made a different factual determination, but rather whether the facts found by the trier of fact are based on reasonable evaluations of credibility and reasonable inferences drawn from the evidence. Rosell v. ESCO, 549 So.2d 840 (La.1989); Sperandeo v. Denny's Inc., 96-328 (La.App. 5 Cir. 10/1/96), 683 So.2d 743, 746-747, writ denied, 96-2634 (La.12/13/96), 692 So.2d 1068.
Using that standard, we find no error in the trial court's determination that rent was reduced to $1500.00 in March and April and $750.00 in May, June and July, 1995. Accordingly, the Browns still have not paid the March, 1995 rent. We find no error in the trial court's ruling that the Earharts were entitled to evict the Browns for nonpayment of rent.
In assignment fifteen, the Browns address the finding of the trial court that they assumed the responsibility for compliance with DEQ regulations, and that the regulations were not met. They argue that the clause used to impose liability for maintenance and testing of the tanks became effective only on the exercise of the option to purchase the property.
As set out infra, the lease provides "Lessee to assume complete responsibility for the gas tanks and pumps. Lessee agrees to adhere to all Louisiana DEQ and to all EPA requirements concerning maintenance and testing". This clause is separate and distinct from a previous paragraph in which the liability for environmental matters or requirements are discussed in the event of exercise of the option to purchase. Further, the record contains a letter dated December 19, 1990 in which the Earharts state,
"Under the terms of the lease, effective date October 1st, 1990, lines number 200, 201, and 202, the Lessee (ie.(sic) Gregory & Jeffrey Brown) assumes the responsibility for the gas storage tanks and pumps as relating to the Louisiana DEQ and federal EPA required tests. It is my understanding that the deadline is December, 1990. Please furnish me with a copy of the results of these tests as soon as they become available".
By his own admission, Gregory Brown received this letter, and had a tank tightness test conducted on the tanks the following year. He admitted the test was conducted one year later than it should have been. Further, he admitted that he did not check the DEQ regulations and did not have the tanks tested annually as required.
At trial, Brenda Williams, an environmental coordinator for DEQ, testified that the steel tanks should have been upgraded in 1989 by the installation of spill and overfill protection and corrosion protection. Because that was not done, the DEQ required a form of leak detection which required annual tank tightness tests. It is clear from the testimony of Ms. Williams that the annual tank tightness tests required by DEQ were not done by the Browns. It is also clear by the Browns' testimony that they made no effort to ascertain what requirements were necessary to comply with DEQ regulations.
Given the lease terms and the letter from the Earharts, we find no error in the trial court's ruling that the Browns were responsible for making sure that the tanks at the service station were in conformance with DEQ regulations. Consequently, we find no error in the trial court's ruling that the Browns have violated the lease terms in this regard.
In assignments seventeen and eighteen, the Browns argue in the alternative that the lease, if found to place responsibility for adherence to DEQ regulations and maintenance of the tanks on the Browns, is unenforceable *985 because it was not a "bargained for, arms length transaction" as so ruled by the trial court.[3] The arguments in support of this assignment of error are based on credibility. As we understand this argument, the Browns assert that the long term lease was to benefit the Earharts because they knew that the underground storage tank system had to be replaced and wished to pass the cost of the upgrading to the Browns. The Browns also allege that the Earharts knew or should have known that the leak detector was improperly installed. Because this proceeding was restricted to evidence on the rule to evict, matters of negligence were not presented. We believe the issue of what the Earharts knew or should have known concerning the cause of the leak is more properly addressed in the merits of the reconventional demand.
The Browns also maintain they have no responsibility for tanks and pumps, or repair and maintenance, since these clauses were not in the 1988 lease. In a related argument contained in assignment of error fourteen, the Browns aver the trial court should have granted reimbursement for two expenditures. First, they request reimbursement for the emergency repairs due to the gasoline spill. Their argument is based on the fact that the leak detector was installed improperly before they first leased the property in 1988. Second, they claim a reimbursement for $5300.00 in roof repair work completed before the spill. We believe these arguments, as is the case with arguments in the preceding assignment, are related to the claim for damages in the reconventional demand which is still viable, and are more properly asserted in that action. Consequently, we pretermit consideration of those issues in this opinion.
For the foregoing reasons, we affirm the ruling of the trial court, and remand the matter for consideration of the demands made in reconvention.
AFFIRMED.
NOTES
[1] Since the time of the confection of the lease, both Earharts became cancer patients and Mr. Earhart has died. The Earharts' daughter, Mardel Earhart Groome, is the executrix of her father's estate and is handling her mother's affairs.
[2] Jeffrey Brown was present at the hearing. It was stipulated that his testimony would be the same as that of Gregory Brown.
[3] Assignment sixteen also relates to this alternative argument, but is based on the assumption, which we have dismissed, that the July 31, 1995 letter did not serve as notice of the violation.