751 So.2d 889 (1999)
Perry Allen HOOKER
v.
SUPER PRODUCTS CORPORATION, Donald R. Schweitzer d/b/a Shamrock Pipe Tools, Ortho Pharmaceutical Corporation, As Successor Corporation to E. Meyers Company, A Division of McNeil Laboratories, The Polymer Corporation and Maylor Supply Company, Inc.
No. 98-CA-1107.
Court of Appeal of Louisiana, Fifth Circuit.
June 30, 1999.
*892 Lloyd N. Shields, Daniel Lund, III, New Orleans, Louisiana, for Appellee.
Glen B. Ansardi, David S. Fos, Kenner, Louisiana, Attorneys for Appellee City of Kenner.
Boris F. Navratil, Baton Rouge, Louisiana, Attorney for Appellant Super Products Corporation.
Robert E. Winn, Sharon Cormack Mize, New Orleans, Louisiana, Attorneys for Appellant The Polymer Corporation.
*893 John R. Miller, Mandeville, Louisiana, Attorney for Appellant Donald R. Schweitzer, d/b/a Shamrock Pipe Tools.
Panel composed of Judges JAMES L. CANNELLA, MARION F. EDWARDS and SUSAN M. CHEHARDY.
EDWARDS, Judge.
Defendants Super Products Corporation ("Super Products"), The Polymer Corporation ("Polymer"), and Donald R.Schweitzer d/b/a Shamrock Pipe Tools ("Shamrock") appeal a jury verdict and a judgment against them and in favor of plaintiff, Perry Allen Hooker ("Hooker") and intervener, the City of Kenner ("Kenner"). Hooker, an employee of Kenner in the Public Works Department, was injured when a section of a sewer hose on the truck which he was operating exploded, hitting him in the face and causing serious permanent and disfiguring injuries. Hooker filed suit against the defendants as well as against Naylor Supply Company and Ortho Pharmaceutical Corporation. Three years prior to trial, both Naylor and Ortho were dismissed from the suit by the plaintiff without prejudice. Kenner intervened in the main demand to recover payments which it made to Mr. Hooker under the Worker's Compensation laws.
A jury trial proceeded on plaintiff's claims against the three remaining defendants, at the conclusion of which the jury found that Super Products, Shamrock, and Polymer were liable to plaintiff for failure to warn of the danger of the products; those parties were found to be comparatively liable to plaintiff in the amounts of 30%, 38% and 32%, respectively. Plaintiff was found to be free from fault, and was awarded damages of $360,000.00. The intervention on behalf of Kenner was tried separately by the judge, who subsequently concluded that Kenner was without fault in the matter, and granted the intervention against defendants in the amount of $74,857.77, with legal interest, in the same comparative fault proportions which the jury awarded. All defendants appeal.
On appeal, Super Products, Polymer, and Shamrock each aver that the court below erred in finding them to be at fault in plaintiff's injuries and they dispute the percentage of those comparative fault findings. They contend that the court should have granted remittitur with respect to the plaintiff. Further, they urge that the court erred in failing to find fault on behalf of Kenner and in failing to reduce the judgment in favor of Kenner by the degree of fault which should have been attributed to it. It is also argued that the court should have dismissed Kenner's intervention. Defendants additionally assert that plaintiff was at fault in the accident which injured him. Several procedural errors were urged by all defendants, who also allege that the court erred in failing to grant a new trial following the decision of the Supreme Court in Keith v. U.S. Fidelity & Guar. Co., 96-2075 (La.5/9/97), 694 So.2d 180. It is urged that the fault of all non-parties should have been quantified by the jury and/or judge.
For the reasons to follow, we set aside a portion of the jury verdict, affirm in part, and render judgment.

DEFENDANTS
Super Products was the manufacturer of the Camel 200M truck upon which the exploding sewer hose was mounted Shamrock was the manufacturer and distributor of the menders and swage tool (which tool was used by Kenner to install a mender at the point where the hose ruptured), as well as the distributor of the hose. Polymer was the manufacturer of the sewer clean-out hose itself.

TESTIMONY AND EVIDENCE
Mr. Hooker testified that, at the time of the injury, he was 61 years old and had worked for the City of Kenner for twenty years. He retired from his position as foreman in the Public Works department one month prior to trial. As foreman, his job was to oversee the crew on the sewer *894 cleanup trucks. He had operated such trucks for about ten years before becoming foreman, and then, continued to use them occasionally. The truck which he routinely employed had the hose assembly on the front bumper. To operate it, he had to stand directly in front of it, anywhere from six inches to a foot and a half away. On the day of the accident, there was a flooding problem which his department was ordered to handle. The Public Works truck was being repaired, so plaintiff requested to borrow a truck from another department. He met two employees of the Waste Water department with their truck at the site of the flooding. He had never operated a truck where the hose was mounted behind the cab, as was the present set-up.
At the time of the accident, he was cleaning the drain line, when he noticed the hose getting tighter than normal. He walked over next to the truck but because of where the hose was mounted, he couldn't reach it from the ground. Suddenly something hit him in the face. Due to the shock of the accident, he did not recall if he had climbed up on the truck. He worked on such trucks all the time, and climbed all over them. When the accident occurred, he was standing close to the front part of the cab. He had seen hoses tighten up before, and had experienced a hose popping and leaking, but never breakage. He took hoses in to be repaired, but never made such repairs himself. When a mended hose came back, it was repaired with a metal sleeve. A hose never broke or separated from its mended part. He never saw the hose which injured him.
There were no warnings on the side of the truck relative to the hazards of a high pressure hose. Plaintiff testified that when he saw a warning, he would read and obey the instructions. Had there been a warning on this truck, he would definitely have heeded it.
He was taken to the emergency room, but remembered little until after his surgery. The pain was bad until he was given medication. After the surgery, he underwent physical therapy for four to five weeks. The healing took place over a period of two years. There were some light scars and his face was indented on the injured side, making it difficult to shave. For some time he was self-conscious, and small children appeared to be afraid of him when he went out.
Plaintiff returned to work on September 9, 1992.
Outside the presence of the jury, and as part of the intervention proceedings, Mr. Hooker testified as to the medical care and worker's compensation benefits which he received from Kenner.
Dr. Scott Greenberg, surgeon board certified in plastic and reconstructive surgery, first saw plaintiff in the emergency room at which time plaintiff had a large complex laceration of the right mid-face, a large gaping hole. There was a bone fracture. Surgery was necessary to close the wound and repair any damaged nerves. The surgery, which took 12 hours, disclosed neuropraxia, or a stretch injury, to one branch of facial nerve, and injury to the buckle nerve (a different cranial nerve). That nerve involves chewing and also involves the main muscles of opening (the jaw). The parotid gland which creates saliva, was completely transected and had to be removed, this resulted in the loss of tissue on plaintiff's face.
Plaintiff tolerated the operation well. Therapy was conducted to enable him to close his eyes and mouth, so that he could sleep and eat properly. He probably has a permanent deficit in terms of his ability to chew, and possibly his ability to talk. The loss of tissue on one side of his face, the caved-in depression, may potentially be corrected surgically.
Keith Osborne testified that he is employed by Professional Service Group ("PSG"), which handles the Waste Water *895 Department for Kenner[1]. At the time of the accident, he worked directly for the city in the Waste Water Department. The truck on which plaintiff was injured, a Camel, was purchased through Super Products, and the parts through Shamrock. He was present and one of the crew at the time of the accident. On that day, the hose, which does not have a guide system, had become lapped over the reel and the crew was trying to unlap it so that it would feed properly. One of the other crew members yelled to someone to get down from the truck, and then there was a big bursting sound. The pressure was stopped, and plaintiff was on the ground. The crew assisted him and called an ambulance. The truck is a dangerous place to be, because the reel up there does turn. When the reel turns, a hand can get caught or hose could grab an arm. He had never heard of the hose breaking at the reel. He did not think there were warning decals on the shield containing the hose, although there could have been. In his experience, one would be just a few feet from the pressurized hose while it is moving on the reel.
Although he did not know why the hose ruptured, Osborne did know the hose was spliced and that the rupture occurred at the splice. He did not look at the hose or mender after the accident.
Edward Breeden, a loss control representative with Creative Risk Management, investigated the accident for Kenner. In the course of his investigation, he collected pieces of the hose which ruptured. The hose was green and had a clamp on one end. However, he lost the pieces after a year or so, when he was cleaning out his garage and discarded the hose.
Dennis McTrammer, employed by PSC, also worked for Kenner at the time of the accident. He repaired rotating equipment, electrical motors, fluid pumps, etc. The hydraulic pressure hoses have a pressure capacity of 2000 psi (pounds per square inch). Occasionally when the hoses get rough edges, they become unsafe and the hose is cut behind its broken spot and repair splices and/or new ends are put on. A swage tool is a device used to put compression clamps on the hoses for repair. This swage tool is manufactured by Shamrock. After the accident, he examined the ruptured hose and saw inside the clamp where the hose is normally crimped there was a full diameter of the hose down inside the clamp-there was still hose debris in the base of the clamp. Several people took parts of the hose, including the coupling which failed.
There was no warning accompanying the swage tool, and the witness was unfamiliar with WEMI standards[2]. He never received any specifications from Polymer on how to couple the hoses. A document labeled as recommended specifications and repair inspection procedures for high pressure hoses, dated in 1988, was also unfamiliar to him. He likewise had not seen a document of materials specification, including assemblies and mending procedures for the hoses. He saw no warnings from either Shamrock, Polymer, or Super Products Corporation regarding any hazards associated with mending or coupling of hoses with the swage. He demonstrated the method of repair to representatives from Shamrock and no changes in such method were required. He was never told that he had to use a Polymer manufactured coupling on the hose. After the swaging procedure, pressure testing is not done on the hose.
On cross-examination, he admitted he had no first hand knowledge as to where the swage tool was purchased, although he had requested a Shamrock tool, nor did he have personal knowledge of whether Kenner received a set of instructions with it. *896 Some of the menders also come from Shamrock.
An exhibit of swage tool instructions was introduced on redirect. After reading it on the stand, McTrammel testified that the directions therein indicated the same repair procedures which he employed.
Hubert Bardell, an employee of PSG, supervises repairs in the Waste Water Department. Following the Hooker accident, the City installed certain warnings on the truck (that only trained, authorized employees are to operate near the equipment). The city purchased two washout hoses from Shamrock, one of which went on the Camel truck involved in the accident. The city also purchased other equipment, including hoses, from Naylor. Menders were usually purchased from Shamrock. There was no warning on the truck, nor on any of the tools, concerning the hazard of high pressure hose rupture. Mr. Bardell did not see the hose and mender coupling after the accident.
There are no records of when menders are put on the hoses. McTrammer was the only person who would have made such repairs. There is a gate on the side of the reel allowing someone to get onto the platform where the reel is located. Bardell would not recommend someone going in there when the reel is turning. Neither Super Products, Polymer or Shamrock ever discussed the possibility of hose rupture with him.
Joseph Nicolosi, director of Public Works for Kenner, testified that while he is involved somewhat in the Waste Water department now, at the time of the accident he was neither familiar nor involved with the operation of that department. He did however know plaintiff to be an outstanding employee. He also knew that when an operator is using the front mounted hose and truck, the worker would stand next to the hose and feed it into the manhole. He did not participate in any training of Mr. Hooker, although he knew that the city conducts periodic safety meetings for employees. He did not know if any of those meetings pertained to the safety of the hoses, etc. The majority of training on use of the equipment comes from the manufacturers.
Dr. E.C. Fitch issued a report and testified by deposition. Dr. Fitch, an engineer, is an expert in hydraulic machinery, hoses and conduits. He is involved in the standards work for the Society of Automotive Engineers (SAE), which promulgates standards for hydraulic machinery. Dr. Fitch tested a piece of hose which he obtained from the maintenance workers at Kenner. The hose came from a reel on a truck in the shop, but he did not know if that was the same truck plaintiff was using at the time he was injured. He was told by Kenner that the green hose, a piranha sewer hose, was from the same reel used in the accident.
In his report, Dr. Fitch found that the hose failure could have occurred because of improper coupling length for the hose, improper grooves and ribs in the hose socket which prevented the coupling from interlocking with the hose, improper burst pressure, and/or a defective reinforcement braid. He also opined that the design of the machine was defective because the surge valve imposed severe stress on the hose and contributed to the expulsion of the hose from the coupling socket. Dr. Fitch concluded that the hose was defective for the service for which it was used. The manufacturer made a serious mistake in selecting the particular hose and coupling for the particular application. He testified that the neutral angle of the reinforcing braid in the portion of hose which he measured was off. When this happens, the individual fibers move against each other during a pressure surge ("fretting"), resulting in the braiding material weakening to the point that it fractures. The hose will rupture at the point where the greatest stress occurs, usually where coupling or a mender has been put on. The rupture in this case occurred in the coupling, and the hose broke as opposed to *897 simply pulling out of the coupling. The braid defect was a manufacturing defect.
During normal operation, a hose of this diameter would develop up to 5000 psi (pounds per square inch) pressure. Specification of the Piranha NP 16 hose used by Super Products on the Camel 200 was not acceptable, because the peak surge or burst pressure should be 2½ times the working pressure and the working pressure on this hose was 4925 psi. He did not check to determine Kenner's specifications as to the pressure and was unfamiliar with specifications of WEMI.
There was no warning in Shamrock or Super Products literature dealing with hazards from rupture of hoses. Dr. Fitch did not examine the engineering drawings of the hydraulic system, but did look at the truck itself. On cross-examination, Dr. Fitch stated that if the hose he examined were in another protective sleeve, this would cut down the danger.
Relative to his written report, Dr. Fitch testified that although there were improper grooves and ribs in the hose socket, he no longer felt they had anything to do with the failure of the hose. Rather, he found the braid angle to be the problem. Also, since he had no evidence of what was actually use in the hose, he backed off his statement that improper coupling length was a problem. He did not think that the coupling had anything to do with the accident.
James Wurster, president of Super Products, testified that the company decided to mount its hose reel behind the truck cab to get the hose away from the operator because the hose, when subjected to wear, has the potential to burst. Further, a containment system separated the operator from the hose, so that as the hose came from behind and over the top of the cab to the front operator, there was a shield, a four inch I.V. hose which the sewer hose itself fed into. In addition, the driveability of the truck was enhanced. These Camel 200 trucks were first manufactured in 1980.
Super Products bought out F.E. Meyers Company, which had also manufactured these types of trucks, Super Products decided to retrofit the earlier (Meyers) models with the containment units. The distributors were given a video which explained the benefits of the containment units. The video was done for commercial reasons in order to sell the retrofit kits. (That video was shown to the jury.) In 1988, Naylor was the distributor of their products in the area. Kenner could have bought a retrofit unit for the machine upon which Mr. Hooker was injured. Super Products is the only manufacturer to supply a safety shield. The hoses used by Super Products are developed by other companies such as Polymer. In 1986, Polymer advised Super Products that it had discontinued availability of splicing equipment for hose repair. As a result, Super Products could not market such repair equipment. Thereafter hoses had to be replaced, not repaired.
Eventually, WEMI was formed to address certain problems in the industry. In 1988, WEMI established and published a nationwide standard for the mending of sewer hoses. Different manufacturers of sewer hoses had different "proprietary colors". Super Products used blue hose. Meyers used green hose prior to its purchase by Super Products. This green hose was manufactured by a company called Aqua Tech. With the WEMI standards coding, the significance of the outer color of the hose became associated with the pressure rating of the hose rather than the manufacturer. In 1988, however, when the truck was delivered to Kenner, Super Products would have been using either blue Polymer hose or white Aqua Tech hose.
The inner color of the hose was assigned to various manufacturers. The fittings were also color coded. A copy of these standards was sent to every distributor, and was published in certain trade journals, *898 as well as distributed at some national trade shows.
As its distributor, Naylor would have received the bid specification from Kenner; if awarded the bid, Naylor would have issued a purchase order to Super Products. That order would specify and ID and a working pressure for the type of hose to be supplied, in this case 2000 PSI working pressure, 5000 PSI burst hose, one inch by 500 feet in length. The distributor would order and send a truck chassis and Super Products would build the machine to order. The purchase order also called for the truck to be painted green. After painting, certain decals would be placed on the truck. On the side door a decal cautioning the user to disengage all belt drives before entering would be installed. All decals were checked. A yellow stripe around the side of the Kenner truck was not painted by Super Products.
There was a "blockbuster" feature on the Super Products hose, in which the water pressure inside the hose would build up gradually rather than suddenly spiking. In a test done by defendant, the maximum pressure spikes which occurred were under 2100 psi. The maximum pressure at the nozzle was 1460 psi. Pressure cannot build up instantaneously because water is always leaving the hose at the nozzle. No sticker warning that the hose was under pressure and could burst was placed on the rear mount reel because the majority of the hose was not near the operator as with the front mount reel. In addition, in the area where the reel was stored there were a number of things which were potentially dangerous, such as the drive system or vacuum pump system with moving belts. A decision was made to put one decal which warns users to stay out of the power unit.
Mr. Wurster helped form the committee which drafted standards for Waste Equipment Manufacturers Institute (WEMI). WEMI published standards with specifications and repair inspection procedures for high pressure hoses in 1988. Super Products would not have sent these standards to the purchaser, Kenner, but instead sent it to distributors. The standards, in part, attempted to insure that the menders and hoses matched.
Relative to the demonstration video shown to the jury, Wurster testified that the company, in trying to market a containment system, put a menders on the hose for the video. The menders were being put on improperly, were failing and were still not sufficient for marketing purposes. An elbow had to be added to the hose in order to run the test. On cross examination, Mr. Wurster stated that a caution decal, warning about possible injury from a rupturing sewer hose, existed on other Camel trucks as far back as 1985, but was not on the truck on which plaintiff was injured. That warning was used on trucks with a front reel. There is a warning to disengage the pump drives prior to entering the reel housing.
On cross examination, Mr. Wurster stated the rear reel mounting was designed for safety reasons, because they knew hoses could rupture. The Kenner truck was delivered prior to the publishing of the WEMI standards. A copy of the WEMI standards was sent to all the distributors. No copies of those letters were introduced at trial.[3] Section 3 of the WEMI standards stated that original equipment manufacturers, such as Super Products, will provide information to distributors and to the product users:
3-B. A placard or label permanently affixed to the vehicle stating the information described in section 3-A. The sign shall be constructed in accordance with American National Standard 235.1 specification for accident prevention signs.
Section 3-A deals with specifications for operating pressure size and outer cover of *899 the high pressure hose. Super Products did not follow-up the Kenner vehicle with this placard. The standards also required that "instructions for installation, maintenance and mending of the hose assembly in accordance with information provided by the hose manufacturer" be sent to the user. This was not done by defendant because Super Products was not offering menders for sale at that time. The company did not send the Polymer mending specifications to Kenner at any time.
A caution decal, warning about possible injury from a rupturing sewer hose, existed on other Camel trucks as far back as 1985, but was not on the truck on which plaintiff was injured. That warning was used on trucks with a front reel. There is a warning on the Kenner truck to close off a valve before draining the tank. Labels are put on a truck per installation labeling, but latitude is taken with their placement. A decal warning which says that the safety shield over the sewer hose is provided to protect operator from physical injury in the event of rupture was not on the Kenner truck. Wurster was positive that the warning about disengaging the belt drive was on the truck, although he did not personally see it.
The containment system on the Kenner truck was in the form of a black hose into which the sewer hose was threaded, combined with the rear mounted reel. After receiving notice from Polymer that it would no longer sell menders, Super Products stopped selling them in the United States but continued to do so in the international market.
Dennis Dufour, maintenance superintendent of PSG, testified that he saw the piece of hose and mender which separated in the accident. The hose tore out of the mender, and a small jagged piece of hose was left inside the coupling. The failure took place near the nozzle, and as is usually the case, the hose was repaired and put back into service. The department has a mender, and they cut out the damaged portion of hose. On cross-examination, Dufour stated that when the city bids for a truck, they rely on the specifications of the manufacturer.
Lawrence Blachman, a product development engineer for Polymer, testified next. He was primarily responsible for the development of the thermoplastic hoses, of which Polymer is a major supplier. All hoses are pressure tested by taking samples for every ten thousand feet of hose produced. Polymer sells through distributors and manufacturers, not directly to end users. He was not able to inspect the failed piece of hose involved in this case, but did inspect the truck, the tools, and the menders which Kenner had. None of the tools were manufactured by Polymer. Mr. McTrammer related the mending procedure to him. Those procedures were adequate up to the point at which the hose is taken out of the machine. There was no mention by McTrammel of any measurements of the swage diameter or length, or of visual inspection of the hose and fitting. Neither was there pressure testing of the assembly after it was mended. Taking measurements and making inspection is essential. There were two sets of dies for the swaging tool; one was matched, the other was not. The unmatched set was distorted. With a mismatched set, the correct swage diameter is not made and the mender applied does not compress the hose wall sufficiently to hold it together; the mender can then separate from the hose.
Because he did not see the actual hose, he was unable to reach any definite conclusions as to the cause of the accident. Some people in Kenner told him that some green hose was the actual hose which failed. The inside and outside diameter of that green hose was within Polymer specifications. In a closed hydraulic system, a higher safety factor is needed then in an open system. Dr. Fitch's recommendations were appropriate in a closed hydraulic system. There are practical problems in building a hose with an eight thousand *900 psi minimum, as recommended by Dr. Fitch. Because the hose is thicker, it would have to be of less length or else would require a huge reel. The hose would also become very heavy and would require more pressure to get it into the sewer line. The pressure spikes which Dr. Fitch spoke of cannot be had in this type of system with this type of hose.
When you put the mender coupling on the hose and swage it, you change the braid angle because you change the diameter. There is no neutral braid angle within the mender. Unless the mender is improperly applied there is no movement in this type of coupling so there can be no fretting to shorten the cycle life of the hose. If there was fretting, it means the mender was improperly applied, improperly machined, or improperly designed. The sample mender is not a Polymer product.
Blachman's opinion was that the coupling applied to the hose failed. Either the mender, or the application of the mender, was improper. McTrammer may not have cut back far enough in his repairs to a piece of hose which was sound. Perhaps the coupling was not properly machined. The hose should have been pressure tested after mending.
After the hoses were color coded, the menders and swage tools were also coded. Between 1986 and 1988, Polymer did not supply menders. Menders were taken off the market. After the WEMI standards were promulgated, Polymer was more comfortable putting menders back on the market. The witness felt that any attempt to determine what caused this accident would be sheer speculation.
On cross examination, he stated that Kenner would have gotten instructions to field test the hose from WEMI, from Polymer, or from the distributor. A sample of instructions Polymer provides when it sells a swage tool did not refer to field testing. He did not take measurements of the hose which Dr. Fitch used to check the braid angle, or whether the hose had stretched in use, nor did he run any tests on the hose or perform calculations. Rather he relied on practical application (the regular testing done by Polymer on all of its hose). If Kenner bought the green hose in 1990, it would not have met the Polymer specifications under WEMI which required yellow hose. However, the construction of the hoses is identical. Shamrock manufactures the swage tools that Polymer sells. In 1990, the Shamrock swage tools and menders could be used with Polymer hose; by 1992, these tools were deleted as approved materials. Kenner was not so informed because Polymer did not know Kenner was a user.
H. Ray Burns was accepted as an expert witness as a mechanical engineer with special expertise in the design, testing and manufacturing of hoses and fittings. He testified that in his opinion, Blachman's procedure relative to adjusting the braid angle to minimize the length of the hose was appropriate. With a restricted flow system such as on the Camel 200, the flow goes out through the hose nozzle. The flow is continuous, with no return back to the tank. A closed hydraulic system has a cylinder or piston which actuates a rod, clamping the system closed so that the flow recycles. This builds the temperature within the system. Mr. Burns studied the depositions of the Kenner personnel and of Wurster, as well as the report of Dr. Fitch. He looked at Super Products' equipment and saw the video presented to the jury. He disagreed with Dr. Fitch's testimony that the surge pressure on the Camel 22 would spike to 4925 psi, because that analysis applied to a closed hydraulic system. He felt the maximum spike would be 1600 psi. Dr.Fitch's "fretting" theory and theoretical braid angle came up many times in the witness's work, and was disputed by various tests. Fretting can cause a 17% reduction in the life of a wire braided hose if the pressure is set at three times the working pressure. Mr. Burns did not agree that the hose broke in the fitting because of the incorrect braid angle. When you swage a fitting onto a hose, the *901 diameter of the hose is reduced. Any movement of the hose inside the fitting means there is something wrong.
Contrary to Dr. Fitch's testimony, there is no SAE standard which applies to this type of hose and requires a four to one burst pressure. Rather, the appropriate factor is 2½ to 1. In the system at issue, there is no buildup of temperature to require a higher factor. He did agree with Dr. Fitch that the cause of the hose and mender separation was either (1) that the coupling did not exhibit the necessary hose grip length and subsequent grip area needed to contain the hose in the socket; (2) the coupling had improper grooves in the socket and corresponding ribs on the nipple which prevented the coupling from interlocking with the hose; or (3) the coupling with its reduced grip area allowed excessive crimping pressure to be applied to the inner liner that caused excessive cold-flow to eject the hose, and cause failure of the joint. He found no defect with the Polymer hose.
On cross-examination, the witness admitted he had not measured the braid angle on the hose. He did not test the Camel 200 truck involved in the proceedings.
Donald Schweitzer of Shamrock Tools testified that his company manufactures sewer cleaning maintenance equipment, sewer nozzles, and other items that clean sewer lines. The swage tool in question was manufactured by Shamrock; however, his business records do not show that any swage tool was sold to Kenner. Such tools were sold to distributors such as Naylor. Shamrock also sold menders, but again, no business records show a sale to Kenner. Shamrock sends instructions with every swage tool it sells. The instructions require inspection of the fitting and give certain tables and measurements relative to the fitting. At no time did Shamrock send a copy of the WEMI specifications to Kenner, and has never undertaken to disseminate those standards to end users. Whether end users utilize the WEMI standards is purely voluntary in his opinion. The company did not send out copies of the Polymer specifications, either. After Shamrock was no longer an approved supplier of menders and swage tools for Polymer, the company continued to sell Shamrock menders for Polymer hose. When Kenner ordered hose, Schweitzer did not see which hose was shipped out of the warehouse.

STANDARD OF REVIEW
Defendants argue that the trial court erred in failing to grant a new trial due to the change in the law effected by Keith v. U.S. Fidelity & Guar. Co., 96-2075, (La.5/9/97), 694 So.2d 180. The opinion in the Keith case was rendered on the day after the jury returned its verdict in the present matter. All defendants filed post-trial motions for new trial, citing Keith, supra, which motions were denied by the trial court. At the time of the trial and subsequent verdict, quantification of employer fault was excluded under the interpretation of La. Civ.Code art. 2324(B)[4] and La.Code Civ. Proc. art. 1812C[5], as *902 expressed in Cavalier v. Cain's Hydrostatic Testing, Inc., 94-1496 (La.6/30/95), 657 So.2d 975. However, in Acts 1996, 1st Ex.Sess., No. 3, Sec. 1, effective April 16, 1996, the legislature amended LSA-C.C. art. 2323 to provide expressly that:
A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal theory of liability, regardless of the basis of liability.
(Emphasis supplied).
Thereafter, the Keith court, finding the amendment to be a procedural change, declared:
Comparing La.Civ.Code art. 2323, as amended, to its predecessor, it is apparent that the basic structure for comparative fault is unchanged. However, we observe that the Legislature added more specific language to Art. 2323 making it mandatory for the determination of the percentage of fault of all persons contributing to an injury, whether those persons are unidentified non-parties, statutorily immune employers, or others.

Keith, supra at page 182.
The court continued:
Viewing the applicability of Act 3 to the case sub judice, it is clear that the substantive right to allocate fault was created in 1979 with the introduction of comparative fault. As such, Act 3 simply delineates a method for enforcing that substantive right as particularly applied to the statutory employer.

Id, at page 183.
Thus, employer fault must be quantified, and the amended statute is to be applied retroactively. Keith, supra.
An appellate court is obligated to adjudge a case before it according to the law existing at the time of its decision. Segura v. Frank, 93-1271 (La.1/14/94) 630 So.2d 714, 725; Charrier v. Charrier, 94-921 (La.App. 5th Cir. 3/26/96), 672 So.2d 983, 985. Where the law has changed during pendency of the suit and retroactive application of the new law is permissible, the new law applies on appeal even though it requires reversal of a trial court judgment that was correct under the law in effect when it was rendered. Id. Where the law has changed after the trial court's decision, the new law's applicability can be argued for the first time only on appeal. Id.
*903 Therefore we must apply Keith to the present case, necessitating that we set aside the portion of the jury's verdict allocating fault. We shall proceed to conduct a de novo review on the issue of comparative fault only as regards the defendants and the City of Kenner. Because we will conduct a de novo review, several of the other procedural errors urged by defendants have become moot. We note that the plaintiff filed a motion in limine prior to trial requesting the court to exclude evidence and testimony on the subject of employer fault or the fault of non-parties (Naylor). The motion was taken under advisement and not ruled upon until trial was completed. Our reading of the record discloses that the defendants were permitted to put on all the evidence which they wished to submit relative to both Kenner and Naylor. Therefore, a remand for new trial requested by defendants is unnecessary since all the relevant evidence is before us.
Neither the damage award nor the judgment in the intervention is interdicted by the above change in the law. The standard for reviewing the award of damages is that of abuse of discretion. Reck v. Stevens, 373 So.2d 498, 501 (La.1979). We review the judgment of the trial judge in the intervention under the manifest error standard.
The evidence presented at trial proved that the hose ruptured at the repaired juncture. Defendants contend that the hose separated because it was badly or improperly repaired; they further allege that plaintiff was not a qualified user of the clean-out truck and when struck by the hose, he was in a dangerous place on the truck itself. Taking all the evidence as a whole, we find that the plaintiff proved that the rupture was caused by inadequate repair due to the use of the wrong tools and parts. Super Products, Polymer, and Shamrock, each had duties to the plaintiff which were breached, and such breaches were all causes-in-fact of plaintiff's injuries.

COMPARATIVE LIABILITY OF THE DEFENDANTS
The Louisiana Products Liability Act (LPLA) establishes the exclusive theories of recovery against manufacturers for damage caused by their products. La. R.S. 9:2800.54 reads:
A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.
B. A product is unreasonably dangerous if and only if:
(1) The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;
(2) The product is unreasonably dangerous in design as provided in R.S. 9:2800.56;
(3) The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; or
(4) The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58.
C. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.55 must exist at the time the product left the control of its manufacturer. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.56 or 9:2800.57 must exist at the time the product left the control of its manufacturer or result from a reasonably anticipated alteration or modification of the product.
D. The claimant has the burden of proving the elements of Subsections A, B and C of this Section.
*904 The record does not disclose evidence that any of the defendants are liable under R.S. 9:2800.55-56, or 9:2800.58. Therefore, in order to prevail against Super Products and/or Polymer, plaintiff must have proven that an inadequate warning made the product unreasonably dangerous in design under R.S. 9:2800.57. That statute states:
A. A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.
B. A manufacturer is not required to provide an adequate warning about his product when:
(1) The product is not dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristics; or
(2) The user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic.
C. A manufacturer of a product who, after the product has left his control, acquires knowledge of a characteristic of the product that may cause damage and the danger of such characteristic, or who would have acquired such knowledge had he acted as a reasonably prudent manufacturer, is liable for damage caused by his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

Super Products
The threshold inquiry is whether, under R.S. 9:2800.54(A), the injury arose from a reasonably anticipated use of the product. "Reasonably anticipated use" means a use or handling of a product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances. R.S. 9:2800.53(7). In the present case, Mr. Hooker had operated a sewer clean-out truck for ten years and customarily stood very near the hose in the truck which he generally operated, feeding it by hand into the manhole; the hose would be guided by hand back onto the reel as it was pulled out of the sewer. Plaintiff was clearly attempting to perform his job in the usual manner when the hose ruptured. There was nothing in the evidence to suggest that an ordinary user, such as plaintiff, would not, under similar circumstances, climb onto the truck to guide the hose onto the reel, since the hose does not have a guide system. Therefore it is clear that plaintiffs action of insuring that the hose fed properly by attempting to guide it is a reasonably anticipated use within the meaning of the statute. Thus, plaintiff met his initial burden of proof.
Mr. Wurster testified that it was known in the industry that hoses could rupture, and could do so at the repair fitting. The WEMI standards, requiring (among other things) that instructions for mending hoses be sent to the ultimate user, came out after manufacture of the Camel 200 truck used by Kenner. According to those standards, a copy of the repair instructions was supposed to be sent by the manufacturers to all distributors. There was no evidence adduced at trial that Super Products complied with this section. The company did not send these standards to Kenner, nor did it forward to Kenner the mending warnings and specifications issued by Polymer. Super Products was aware that in the instant case, the user was Kenner. A caution decal warning about possible injury from a rupturing *905 hose was not on the Camel truck in question, nor was a warning that the safety shield over the hose was provided to protect the operator from physical injury in the event of rupture. The only decal on the truck warning the user of any hazards was placed on the driver's side. There was testimony that there were no decals on the shield containing the hose.
Section 2800.57(A) does not change Louisiana law and, as required by prior law, a manufacturer must use reasonable care in deciding whether to warn. Dunne v. Wal-Mart Stores, Inc., 95 2047 (La.App. 1st Cir. 9/10/96), 679 So.2d 1034, 1038. There is no duty for a manufacturer to warn of open and obvious dangers. Zeller v. Olympic Marine Co., 96-771 (La. App. 5th Cir. 3/12/97), 692 So.2d 1172, 1175.
Under the circumstances of this case, warnings should have been placed on the truck in such a manner that all operators could have been aware of the danger of being near the hose or hose shield on this particular vehicle. If there was any warning decal on the truck at all, it was definitely not on the side where plaintiff was working. The danger of being near a hose which could possibly rupture cannot be considered open and obvious, since handling a similar hose was part and parcel of plaintiffs usual occupation.
Once the trier of fact determines that the inherent danger is not obvious, and the consumer is not aware of or trained to detect that danger, then the warning, or lack thereof, must be scrutinized. Clark v. Jesuit High School of New Orleans, 572 So.2d 830 (La.App. 4th Cir. 1990), writ denied, 576 So.2d 48 (La. 1991). Therefore, the warning must be: (1) properly worded to signify the intensity of the inherent danger in the product; (2) properly placed on the product so that the consumer cannot avoid seeing it; and (3) it must convey to the consumer that injury or damage can result from a normal or intended use of the product. Id. The manufacturer can then present evidence to show its product either did not require a warning or that the warning that was provided was adequately worded or placed. Id.

Asbestos Plaintiffs v. Bordelon, Inc., 96-525 (La.App. 4th Cir.10/21/98), 726 So.2d 926, 1998 WL 790680.[6]
Plaintiff testified that had he read a warning about the hose, he would have heeded it. In the present case there was no warning for plaintiff to see.
According to R.S. 9:2800.54(C), the unreasonably dangerous characteristic must exist at the time the product left the manufacturer's control or result from a reasonably anticipated modification. R.S. 9:2800.53(8) defines reasonably anticipated alteration or modification:
"Reasonably anticipated alteration or modification" means a change in a product that the product's manufacturer should reasonably expect to be made by an ordinary person in the same or similar circumstances, and also means a change arising from ordinary wear and tear. "Reasonably anticipated alteration or modification" does not mean the following:
(a) Alteration, modification or removal of an otherwise adequate warning provided about a product.
(b) The failure of a person or entity, other than the manufacturer of a product, reasonably to provide to the product user or handler an adequate warning that the manufacturer provided about the product, when the manufacturer has satisfied his obligation to use reasonable care to provide the adequate warning by providing it to such person or entity rather than to the product user or handler.

*906 (c) Changes to or in a product or its operation because the product does not receive reasonable care and maintenance.
While there was testimony by Mr. Wurster, that certain warning decals were usually placed on the trucks, plaintiff and his witnesses testified that no such warnings were on the truck in question, and there was no evidence to the contrary. Even though Mr. Wurster also testified that a yellow stripe on the truck was not painted on by Super Products, there was no proof via documentation or testimony that painting the stripe operated so as to remove or alter any warning decals which may have been on the truck as delivered, or that Kenner had in fact removed any such warnings. Therefore, while there was evidence of some alteration to the truck, there was no proof that such changes modified or removed an otherwise adequate warning. Under all these facts, we find that Super Products had a duty to warn plaintiff of the dangers of being near the hose mechanism on the truck, and of the potential dangers of a rupturing hose, and failed to do so. As a result, plaintiff was injured because he was so near to that hose. Super Products is therefore liable to plaintiff under the LPLA for failure to warn, and such failure was a cause-in-fact of the accident.

Polymer
It was shown at trial that as the manufacturer of the sewer hose, Polymer knew that repair of its hoses was to be expected and the addition of couplers or menders in its hoses was a reasonably anticipated alteration. Documents were introduced which evidenced that Polymer was aware of what it considered to be improper or substandard repair of its hoses. For example, material specifications for the Piranha hose included mending procedures which warned that "the use of menders and mending tooling that has not been subjected to the quality assurance procedures of The Polymer Corporation shall be at the risk of the user". Following were explicit instructions on inspecting and mending hoses:
Failure to properly inspect, repair (mend), or test the hose assembly before being returned to service can cause a failure of the hose and/or fitting or mender. Due to the high pressures generated, a failure may result in damage to property, personal injury, or death.
That document also recommended use of the Shamrock 682 swaging machine for the installation of menders. By April of 1992, the Shamrock swager was no longer approved by Polymer for repair of its hoses. This information was never disclosed to Kenner. Other precautions were noted in other documents, warning that the hose or fitting could fail in pressure testing, and that the high pressures involved posed a hazard of damage, injury, or death. A memo to distributors from Polymer stated that use of non-Polymer end fittings can result in failure. It is clear that repair and mending of these hoses was a reasonably anticipated modification which Polymer expected to be made from ordinary wear and tear, and further, that use of other than Polymer produced parts was foreseen.
Kenner's witnesses testified that the Polymer warnings, specifications, and/or instructions were never received by them. Polymer failed to prove at trial that the end users ever received these warnings, etc. Mr. Blachman, testifying on behalf of Polymer, agreed that Polymer's warnings and instructions should have been made known to the user; however, Polymer did not undertake to do so. Blachman could not say how the user would be made aware of such warnings. There was no evidence or testimony indicating that Polymer made any effort or had any mechanism in place to insure that the users of its product were made aware of the danger of repairs not made to its specifications.
The determination of a legal duty which obliges the defendant to protect the plaintiff from the risk presented is a legal *907 question for the trial court to determine. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364, 1371 (La.1984). The particular facts and circumstances of each individual case determine the extent of the duty and the resulting degree of care necessary to fulfill the duty. Kent v. Gulf States Utilities Company, 418 So.2d 493, 497 (La.1982).
There was no evidence at trial that the danger of using unapproved menders or procedures was either a matter of common knowledge or obvious to the ordinary user (Kenner). Under the LPLA as applied to the facts of this case, we find that Polymer had a duty to make known to the users of its product that only certain parts and tools, and specially detailed repair procedures, would result in a safely mended product and that use of other tools and parts could result in hose rupture.
As opposed to the present case, compare Hoyt v. Wood/Chuck Chipper Corp., 92 1498 (La.App. 1st Cir. 1/6/95), 651 So.2d 1344, cited by defendants. There the ignition safety system was replaced with a toggle switch, which the plaintiff accidentally hit. The court determined it was an unsafe material alteration of the power unit which could not have been reasonably anticipated by the manufacturer. Plaintiffs testimony in that case demonstrated his awareness that when changing the blades of a chipper, he should turn the ignition switch "off" and remove the key to prevent accidental activation. There was no testimony in the present case that either Kenner, or plaintiff himself, was aware of any problem with the repair procedure or the repaired hose.
A manufacturer's duty to anticipate that users might replace certain worn out parts on its product does not include the risks occasioned by the use of improper or substandard replacement parts.
Hoyt, supra, at 1352, citing Goins v. Galion Mfg. Co., 626 So.2d 1200 (La.App. 3rd Cir.1993), writ denied, 93-2888 (La.1/28/94), 630 So.2d 792. These cases were based on Frey v. Travelers Ins. Co., 271 So.2d 56 (La.App. 4th Cir.1972):
....it is impossible to place upon a manufacturer of a product the obligation to warn against conceivably defective repairs to its product made by third persons. These repairs could be made in an infinite number of ways, and it is relatively impossible for a manufacturer to anticipate all of these methods of defective repair and to warn against them.

Frey, supra at 59.
We find the present case to be clearly distinguishable from that entire line of jurisprudence. Use of the non-Polymer menders and Shamrock swager were clearly foreseen by Polymer, which wrote documents on this issue yet failed to inform Kenner of the danger. Under all of these circumstances, we find Polymer is liable for failure to warn of the known dangers of this type of hose repair. Failure to so warn led to the use of the improper menders and/or coupling, swaged on a machine which was not appropriate for use with the Polymer hose. This use was a cause of the rupture and therefore a cause-in-fact of plaintiff's accident.

SHAMROCK
Shamrock was the manufacturer and seller of the swage tool which Kenner used to repair the hoses. Invoices introduced at trial evidenced that Shamrock also sold sewer hose manufactured by Polymer to Kenner in 1990. Shamrock continued to sell its manufactured menders for Polymer hose after it was no longer an approved supplier of menders. The testimony demonstrated that Kenner bought most of its menders from Shamrock. At no time did Shamrock inform Kenner about the WEMI standards, which Shamrock considered to be purely voluntary specifications. There was absolutely no evidence that Shamrock informed Kenner that only Polymer menders had been approved as safe on Polymer hoses. Copies of the Polymer hose specifications in *908 Shamrock's possession were not sent to Kenner. Under the facts of this case, as the manufacturer of its own menders and distributor of the Polymer hose, Shamrock had a duty to inform Kenner that its menders were not approved for use with that hose and that such use was at the risk of the user. Even assuming that Shamrock manufactured menders were not used here, a similar warning relative to use of the swager was required. A manufacturer's duty to warn generally includes a duty to provide safe use instructions. Hines v. Remington Arms Co., Inc., 94-0455 (La.12/08/94), 648 So.2d 331, 337; Taylor v. American Laundry Machinery, Inc. 27,121 (La.App. 2nd Cir. 6/23/95), 658 So.2d 288, 291-292. However, the duty does not require warnings or instructions concerning dangers that are or should be obvious to the ordinary user. Id. As found hereinabove, the danger of using non-approved menders or a non-approved swage tool on the Polymer hose was not obvious to Kenner, absent the information from Polymer and/or the manufacturers' specifications. Plaintiff proved that the swager did not come with instructions to pressure test following repair. Just as Polymer was obliged to provide Kenner with safe repair instructions relative to its hose, so too was Shamrock obliged to warn Kenner of to the safe use of its menders and/or its swage tool with the Polymer hose. Therefore, Shamrock as a manufacturer is also liable for failure to warn of a characteristic of its product that may cause damage and the danger of such characteristic.

Kenner
Under R.S. 9:2800.53(8)(c), the user has a duty to provide reasonable care of the product at issue. The question of duty and reasonableness is usually determined according to the facts of each case. See e.g. Aucoin v. DOTD, 97-1938, 93-1967 (La.4/24/98), 712 So.2d 62, 65. The determination of whether a particular risk of harm is reasonable is a matter wed to the facts of the case. Celestine v. Union Oil Co. of California, 94-1868 (La.4/10/95), 652 So.2d 1299, 1304.
Whether a particular risk of harm is reasonable cannot be determined in a vacuum. The phrase "unreasonably dangerous", in the words of Louisiana's late distinguished Professor Wex S. Malone, "has no discernible content of its own and ... must acquire its meaning solely from the environment attendant on each of the variety of disputes in which it is put to use."
Celestine, supra at 1304, citing Ladue v. Chevron, USA, Inc., 920 F.2d 272 (5th Cir.1991).
Under the facts of this case, and based on the record as a whole, we find that given the facts known to Kenner, the maintenance and repair of the hose was reasonable within the meaning of the statute. It was shown definitively that Kenner was never appraised of the proper and safe tools or material to use for mending the Polymer hose. Information relative to the necessity of field testing was contained in the documents which were never forwarded by the manufacturers. Mr. Blachman testified that Kenner's methods of repair were very good up until the point at which the hose should have been field tested. Defendants urge that Kenner used a swage machine with improperly fitted and mismatched dies. However, it was never proven at trial that that machine was used in the repairs involved in the present accident, or that at the time of the accident, the dies were mismatched or ill-fitting. In summary, there was no evidence that Kenner was at fault in improperly repairing the hose.

Plaintiff
As we have stated above, plaintiff was attempting to perform his job in the usual manner when the accident happened. He was not aware of the danger of a bursting hose, and was not aware of the danger of being so near the reel mounting. He would have heeded any warning he saw or *909 was given. We find no fault on the part of plaintiff.

Naylor
We have found hereinabove that defendants were permitted to put on evidence relative to Naylor even though that company had been dismissed from the lawsuit, and was not made a party by any of the remaining litigants. Our examination of the trial record discloses no evidence to implicate Naylor as the distributor of the hose or menders in the present case. Naylor was the distributor of the truck. However, there was no evidence that the company possessed any warnings relative to the hose and/or menders; neither was there evidence that any warnings on the truck which may have been on the truck itself had been removed or altered by Naylor. In conclusion, there was no showing of fault on the part of Naylor, a non-party to the suit.

Apportionment Of Fault
Although we have made an independent determination of the liability of the defendants, we have considered the jury's apportionment of fault and find those allocations to be reasonable and supported by the evidence. We therefore adopt them and find the following percentages of liability:

Super Products 30%
Shamrock 38%
Polymer 32%
Perry Hooker 0%
Kenner 0%
Naylor 0%

DAMAGES
In appealing damages, defendants have urged that the court erred in admitting photographs of the defendant taken before, during, and after plaintiffs surgery, as well as photographs taken forty-six years prior to trial. La.Code E. art. 401 provides that relevant evidence is that having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without such evidence. La.Code E. art. 402 provides that relevant evidence is admissible. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. La.Code E. art. 403. The trial court is vested with wide discretion in determining relevancy of evidence and its ruling will not be disturbed on appeal absent a showing of manifest abuse of that discretion. Earhart v. Brown, 97-522 (La.App. 5th Cir. 10/28/97), 702 So.2d 976, 984.
Mr. Hooker testified at trial that he did not have recent photographs of himself, and there was no showing to the contrary. Generally, in order for a photograph to be admissible, it need only be established that the photograph depicts what it purports to depict. Differences or changes in conditions do not necessarily exclude a photograph where the changes and differences are explained. Bico Enterprises, Inc. v. Cantrell, 413 So.2d 260, 264 (La.App. 3rd Cir.1982); Allemand v. Zip's Trucking Co., Inc., 552 So.2d 1023, 1029 (La.App. 1st Cir.1989). The jury was aware that the personal pictures of plaintiff were forty-one years old, and could assess the proper weight to them considering that knowledge.
Relative to the surgical photos, we find that while some of the photographs are unpleasant, they are not necessarily inflammatory and are clearly relevant to the issue of damages. The photos enabled the jury to show the severity of the injuries to plaintiffs face and the procedures necessary to correct those injuries. We do not find them so gruesome that the potential for prejudice outweighs the relevancy of the photographs. See Lougon v. Era Aviation, Inc., 609 So.2d 330 (La.App. 3rd Cir.1992); Smith v. Juneau, 95-0724 (La.App. 4th Cir. 4/9/97), 692 So.2d 1365; Bruce v. Rogers Oil Tool Services, Inc., 556 So.2d 922 (La.App. 3rd Cir.1990). Under the present circumstances, we find *910 that the jury was neither mislead nor confused. Accordingly, we see no abuse of the trial court's discretion in admitting the photographs.
Plaintiff sustained a jaw fracture and had a gaping hole in his face. He sustained deep tissue losses eliminating most of his cheek. Over 12 hours of surgery were necessary and plaintiff suffered injury to several nerves in his face. He had to undergo therapy to learn how to close his eyes and mouth and probably suffers a permanent deficit in his ability to chew and talk. Future surgery may be necessary to correct the caved-in depression on his face.
The discretion vested in the trier of fact is great, "even vast," so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); Stevenson v. Louisiana Patient's Compensation Fund, 97-709 (La.App. 5th Cir. 4/9/98), 710 So.2d 1178, 1181.
The standard for the review of damage awards is whether, after an articulated analysis of the facts, this court finds that the trial judge abused his great discretion. Bostwick v. M.A.P.P. Industries, Inc., 97-791 (La.App. 5th Cir. 12/30/97), 707 So.2d 441, 448; Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). This determination is made with consideration to the individual circumstances of the injured plaintiff. Bostwick v. M.A.P.P. Industries, Inc., 707 So.2d at 448; Theriot v. Allstate Ins. Co., 625 So.2d at 1340. After an analysis of the facts and circumstances peculiar to the particular case and plaintiff, an appellate court may conclude that the award is inadequate. Bostwick v. M.A.P.P. Industries, Inc., 707 So.2d at 448; Theriot v. Allstate Ins. Co., 625 So.2d at 1340. Only then is a resort to prior awards appropriate, and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Bostwick v. M.A.P.P. Industries, Inc., 707 So.2d at 448; Theriot v. Allstate Ins. Co., 625 So.2d at 1340.
Lapeyrouse v. Wal-Mart Stores, Inc., 98-547 (La.App. 5th Cir. 12/16/98), 725 So.2d 61, 1998 WL 874971.
Under the facts of this case and considering the impact of the injuries to the plaintiff, we find no abuse of discretion in the damages awarded.

INTERVENTION
For the reasons stated hereinaove, we find no manifest error in the trial court's finding that Kenner was not at fault. Defendants allege that the intervention should have been dismissed due to Kenner's spoilation of the evidence, i.e. the damaged hose.
The theory of spoilation of evidence refers to an intentional destruction of the evidence for the purpose of depriving the opposing parties of its use. Randolph v. General Motors Corp., 93-1983 (La.App. 1st Cir. 11/10/94), 646 So.2d 1019, 1027. Furthermore, the presumption that evidence which a litigant fails to produce is detrimental to his case, is not applicable when the failure to produce the evidence is adequately explained. Constans v. Choctaw Transport, Inc., 97-0863 (La.App. 4th Cir. 12/23/97), 712 So.2d 885, 902; writ denied, Constans v. Choctaw Transport, Inc., 98-0412 (3/27/98), 716 So.2d 892. In the present case, representatives of Shamrock viewed Kenner's repair equipment within 3 months of the accident and apparently did not request examination of the hose. The hose was thrown away approximately one year after the accident by an employee of Creative Risk Management. The trial showed, and we have found, that the hose separated at the point of repair. Polymer suggests that a mender with a defect in design or manufacture may have caused the failure. As we have found above, such cause would not be attributable to Kenner. The City followed a *911 repair practice approved by Blachman up to the point of field testing, a procedure of which Kenner was not made aware (see above).
Kenner was entitled to recover the sums paid in compensation under La. R.S. 23:1101(B).[7] Following plaintiff's injury, Kenner was obligated to pay not only weekly benefits and medical expenses, but also a lump sum amount for disfigurement under R.S. 23:1221(4)(p); under 23:1101(B), it is entitled to recoup that sum from defendants notwithstanding the personal injury award to the plaintiff. Defendants allege that they have twice paid for the same injury. Under the statute, Kenner is entitled to recover paid compensation in the same percentage as plaintiff and may be reduced only if, and to the extent that Hooker was guilty of comparative fault.
Neither can plaintiff's damage award be reduced. The collateral source rule holds that a tortfeasor is not entitled to a credit for payments made to a plaintiff through collateral sources independent of the wrongdoer's procuration or contribution. Dumas v. Harry, 94-19 (La.App. 5th Cir. 5/11/94), 638 So.2d 283, 286.
For the foregoing reasons, we find the defendants Super Products, Shamrock, and Polymer, are liable to plaintiff in the attributed percentages of 30%, 38%, and 32% respectively. In all other respects the judgment of the trial court dated May 23, 1997 is affirmed. Further, the judgment of the trial court dated March 31, 1998 in favor of Kenner is affirmed.
Defendants are assessed the costs of this appeal in the same percentages delineated above, that is, their respective percentages of fault.
SET ASIDE IN PART; JUDGMENT RENDERED; JUDGMENTS AFFIRMED.
NOTES
[1] PSG is a treatment plant, and services the lines through the city of Kenner for the Waste Water Department.
[2] Waste Equipment Manufacturer's Institute; see testimony of James Wurster, infra.
[3] Mr. Wurster testified these documents were destroyed in a flood.
[4] C.C. art. 2324 reads:

A. He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.
B. If liability is not solidary pursuant to Paragraph A, then liability for damages caused by two or more persons shall be a joint and divisible obligation. A joint tortfeasor shall not be liable for more than his degree of fault and shall not be solidarily liable with any other person for damages attributable to the fault of such other person, including the person suffering injury, death, or loss, regardless of such other person's insolvency, ability to pay, degree of fault, immunity by statute or otherwise, including but not limited to immunity as provided in R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable.
[5] Code Civ. Pro. art. 1812(C) reads in pertinent part:

In cases to recover damages for injury, death, or loss, the court at the request of any party shall submit to the jury special written questions inquiring as to:
2)(a) If appropriate under the facts adduced at trial, whether another party or nonparty, other than the person suffering injury, death, or loss, was at fault, and, if so:
(i) Whether such fault was a legal cause of the damages, and, if so:
(ii) The degree of such fault, expressed in percentage.
(b) For purposes of this Paragraph, nonparty means a person alleged by any party to be at fault, including but not limited to:
(i) A person who has obtained a release from liability from the person suffering injury, death, or loss.
(ii) A person who exists but whose identity is unknown.
(iii) A person who may be immune from suit because of immunity granted by statute.
[6] Although this case was generally decided using pre-LPLA law, we find the applicable statutes do not change this analysis.
[7] LSA R.S. 23:1101(B) reads:. Any person having paid or having become obligated to pay compensation under the provisions of this Chapter may bring suit against such third person to recover any amount which he has paid or becomes obligated to pay as compensation to such employee or his dependents. The recovery allowed herein shall be identical in percentage to the recovery of the employee or his dependents against the third person and, where the recovery of the employee is decreased as a result of comparative negligence, the recovery of the person who has paid compensation or has become obligated to pay compensation shall be reduced by the same percentage.